PETER HARMONY AND OTHERS, CLAIMANTS OF THE BRIG MALEK ADHEL, *v.* THE UNITED STATES.

THE UNITED STATES *v.* THE CARGO OF THE BRIG MALEK ADHEL.

Under the act of Congress of March 3, 1819, ch. 75, (200,) to protect the commerce of the United States and punish the crime of piracy, any armed vessel may be seized and brought in, or any vessel the crew whereof may be armed, and which shall have attempted or committed any piratical aggression, search, restraint, depredation, or seizure upon any vessel; and such offending vessel may be condemned and sold, the proceeds whereof to be distributed between the United States and the captors, at the discretion of the court.

It is no matter whether the vessel be armed for offence or defence, provided she commits the unlawful acts specified.

To bring a vessel within the act it is not necessary that there should be either actual plunder or an intent to plunder: if the act be committed from hatred, or an abuse of power, or a spirit of mischief, it is sufficient.

The word "piratical" in the act is not to be limited in its construction to such acts as by the laws of nations are denominated piracy, but includes such as pirates are in the habit of committing.

A piratical aggression, search, restraint, or seizure is as much within the act as a piratical depredation.

The innocence or ignorance on the part of the owner of these prohibited acts, will not exempt the vessel from condemnation.

The condemnation of the cargo is not authorized by the act of 1819.

Neither does the law of nations require the condemnation of the cargo for petty offences, unless the owner thereof co-operates in, and authorizes the unlawful act. An exception exists in the enforcement of belligerent rights.

Costs in the admiralty are in the sound discretion of the court; and no appellate court should interfere with that discretion, unless under peculiar circumstances.

Although not *per se* the proper subject of an appeal, yet they can be taken notice of incidentally, as connected with the principal decree.

In the present case, as the innocence of the owners was established, it was proper to throw the costs upon the vessel, which was condemned, to the exclusion of the cargo, which was liberated.

THIS case came up by appeal from the Circuit Court of the United States, for the district of Maryland, having originated in the District Court.

On or about the 30th of June, 1840, the brig Malek Adhel sailed from New York bound to Guayamas, in California, under the command of Joseph Nunez. The vessel was armed with a cannon and

some ammunition, and there were also pistols and daggers on board. It appeared from the evidence, which is hereinafter particularly set forth, that she stopped several vessels upon the high seas, and at length put into the port of Fayal, where she remained for some days. Departing thence, she arrived at Bahia, in Brazil, about the twenty-first of August, 1840, where she was seized by the Enterprize, a vessel of war belonging to the United States, and sent into the port of Baltimore for adjudication. A libel was there filed against vessel and cargo upon five counts, all founded upon the act of Congress to protect the commerce of the United States, and to punish the crime of piracy, passed on the 3d of March, 1819, ch. 76, (200.) Two other counts were afterwards added in an amended information, charging the acts complained of to have been done in violation of the laws of nations.

A claim was filed for the brig, her tackle, apparel, furniture, and cargo, on behalf of Peter Harmony, Leonardo Swarez, and Bernard Graham.

The evidence produced upon the trial in the District Court, will be recapitulated when the proceedings before the Circuit Court are stated; under which evidence the case was argued, together with the following admission of the proctors for the United States:

|  |  |
|---|---|
| United States<br>*v.*<br>The Malek Adhel and cargo. | District Court, United States. |

The proctors of the United States in this case admit, for the purposes of this case, and to have the same effect as if fully proven, that the claimants were, when the Malek Adhel left New York, the exclusive owners of that vessel, and were such owners during the period the acts stated in the information are alleged by the United States to have been done. And they also admit, that the claimants never contemplated or authorized said acts. They further admit that the equipments of the said vessel when she left New York, and ever afterwards, were the usual equipments of a vessel of her class, on an innocent commercial voyage from that port to Guayamas, the voyage stated in the evidence in this case. NATH'L WILLIAMS,

and REVERDY JOHNSON,

*Baltimore,* 15 *June,* 1841. *Proctors for the United States.*

The District Court condemned the vessel, restored the cargo to the claimants, apportioned a part of the costs upon the claimants, and directed the residue to be deducted from the proceeds of the property

condemned. Both parties appealed from this decree; the claimants from the condemnation of the vessel, and the United States from that part of it which restored the cargo.

The cause came before the Circuit Court upon the evidence which had been given before the District Court, (reduced to writing by consent,) and upon additional evidence which is set forth in the following deposition. It was corroborated in its main points by the evidence of two other persons.

John Myers, a witness, produced and examined on the part of the United States, deposes as follows:—

That he was not first mate when he joined the Malek Adhel; Peterson was first mate; witness joined her 23d June, 1840. On Friday, afterwards, Peterson came on board, hauled the vessel out into the stream. On Sunday, Captain Nunez told Peterson to go on shore on account of a quarrel; Peterson was intoxicated; witness was then made first mate; witness told the captain, that one of the crew (W. R. Crocker) was competent to go out as second mate, and he was then promoted to that office. On Tuesday, 30th June, took pilot, got under weigh about ten or eleven o'clock that day, and went to sea; discharged the pilot on afternoon of same day; fourth or fifth day out, captain said the chronometer wouldn't speak, had forgotten to wind it up; on the 6th of July, saw a vessel standing to the northward, and we to the eastward, five or six miles apart; ran down to the vessel and hove maintopsail back; ran to leeward and then to windward of her, and fired a blank cartridge; hailed the vessel and asked "where from?" they said from Savannah, bound to Liverpool; we hailed her again, and told her to send her boat alongside; she sent her boat with four men and an officer, and they came alongside; Captain Nunez asked if they had a chronometer; officer in the boat said he did not know whether they had or not; would go on board and see; went on board and returned in about half an hour with a chronometer; brought it on board, and while we were regulating our chronometer, our captain and four men went on board the other vessel, which was the "Madras, of Hull;" captain stayed on board a short time and then returned; they then took their chronometer and returned to their vessel, the Madras; while we were hoisting our boat up and securing her, the Madras made sail; as soon as the boat was secured, we ran to leeward some distance, and fired another blank cartridge, but not in the direction of the Madras, and then proceeded on our own course. Next, about

9th or 10th July, a vessel was standing to the westward, we to the eastward; captain said he would run after the vessel and catch her, as he wanted to send a letter to New York; made sail after her, and finding we did not come up very fast, we fired a blank cartridge; they still not taking any notice, our captain told the men to load a gun with shot; loaded the gun with shot and fired, when the other vessel hove her maintopsail back; we were about half a mile apart; we both had our American flag flying at first; when the second shot was fired, Captain Nunez ordered the Mexican or Columbian flag to be hoisted; we then hailed; they said they were from Liverpool, bound to Charleston; her name was the brig " Sullivan;" she was an American vessel; had " Sullivan, New York," on her stern; hailed her, and told her to send a boat alongside; while they were coming, our captain told Martin (called Peter Roberts in the shipping articles) to tell the crew not to speak any English, while the boat was alongside; this order the captain first told him in Spanish, then in English; when the boat came alongside, they asked where we were from; captain told Martin in Spanish, to say, we were from Vera Cruz, bound to Barcelona, and out forty-five days; Martin did so; our captain then told him we wanted some lamp-oil; the officer in the other boat said he did not know whether they had any, but he would go on board and see; when they reached their own vessel, they hoisted their boat, and proceeded on their course; we had lamp-oil sufficient to last us twelve months; after they proceeded on their course, we made sail likewise; ran to leeward and fired a shot at her; this fire our captain ordered Martin to make; he, (Martin,) generally acted as gunner. Martin belonged to Malaga, and spoke Spanish; at the time of second fire, the vessels were about an eighth of a mile apart, hailing distance; we then kept on, and she did the same; the gun was fired at her; we were then standing to eastward, she to westward; did not see where the ball struck.

The next vessel we saw and spoke, was the " Ten Brothers;" this was two or three days after the affair with the Sullivan; passed her without doing any thing. Next vessel we met, was the " Vigilant, of Newcastle, England;" spoke her; she showed English colours; hailed her, and told her to send her boat alongside; she did so. Nunez asked if they had a chronometer; they said they had none; they were out of water, and wanted bread; we gave them two small barrels and some bread, by our captain's orders; we went on our course. The next vessel we met was the San Domingo,

two days afterwards; our captain was acquainted with the passengers on board; he asked them to dine with him, which they did; after they left, Captain Nunez told witness, that the passenger had been a slaver, and was just returning from a prosperous voyage; the vessel belonged to Terceira, one of the Western Islands; she was Portuguese; we laid together that night, and the next morning the Portuguese sent on board of us to buy provisions; we then parted company, and two or three days after, went into Fayal; Nunez said his intention in going to Fayal, was to repair the vessel, and get his chronómeter rated; remained there five or six days; had one carpenter employed four days, who did some slight work; he made a side ladder and some awning extensions, and put her to her head to find out leak. The principal leak was about eight or ten inches above the water line; the vessel leaked at sea, but not at Fayal; leaked as bad after we left there as she did before; the place of the leak discovered at Rio; there never having been oakum at all in that part of the seam, could put a knife in the seam; leak came into cabin; that leak was not stopped at Fayal.

We took in at Fayal potatoes, bread, and beef, for the use of the crew; we also took in two men as passengers, and a cabin boy; one of the passengers was named Silvie and the other Curry; the boy is here; the last I saw of the passengers was at Rio; got under weigh from Fayal on Tuesday; do not know whether Nunez knew the two passengers before he saw them at Fayal; came to anchor and waited until Wednesday; there was a pleasure-party to come on board to sail about the harbour; in attempting to tack she missed stays, captain at the helm; missed stays a second time; we were about twenty yards from the rocks; Nunez knew nothing of the usages of an American vessel before we left New York; I always worked the vessel myself; Nunez might have known, but he did not speak English well enough to make the men understand. After the sailing match about the harbour, we left Fayal with the whaling vessel Minerva, from New Bedford; Nunez went on board of her and took the chronometer to have it rated; had had nothing done with it at Fayal; Nunez knew nothing about managing a chronometer, though it is the captain's duty. Captain Nunez remained on board the Minerva five or six hours; he went on shore at Fayal before we had our sails furled; he went in a shore boat. After Nunez came from the Minerva we made sail and proceeded on our course; he brought chronometer with him: next day we saw a ves-

sel standing to westward with all sail set, going directly before the wind; we were standing to southward; Nunez ordered to chase her; finding we did not come up very fast we fired, by Nunez's orders, a blank cartridge towards her; she still went on her course; Nunez ordered one of the guns to be shotted and fired at her, which was done; she then hove her maintop back; we were then about a mile astern of her; we rounded to, to fire at her; we came up, hailed her; she said she was from Palermo, bound to Boston; she was the "Emily Wilder;" told her to send her boat alongside with their chronometer; they came alongside with the chronometer; we rated ours by it; I rated it and found a difference of time, and noted it in the log-book; after comparing the time of the two, they then took chronometer and went on board again; I made the entry in the log-book; we each made sail and stood on our course; they asked us no questions, except where we were from; Nunez said, from New York, bounded around Cape Horn; we stood to southward until 4th of August; the day before, captain said he was going to Rio; I told him it was a bad place to go, because it was a rendezvous for American vessels of war; on the 4th of August Nunez came on deck about half-past seven in the evening, and found fault with some orders witness had been giving, and Nunez told me he did not want me to do more work on board the ship, and I accordingly went off duty; we ran on our course; that night Captain Nunez had the watch from eight to twelve; I heard a noise on board, went up and saw a vessel close ahead on the weather bow; when we came up Nunez hailed her, and told them to heave the maintop back; they did so, and we did the same; this was about ten o'clock at night; hailed them again, and told them to send their boat aboard of us with the captain and his papers; this they said they could not do, as their boat leaked and the night was dark; Nunez then got angry and told us to double shot the gun; it was done, and fired towards the strange vessel; Martin directed the gun; we were within close hailing distance. Curry, the forementioned passenger, then hailed in English and told them again to send their boat; the other captain answered in Portuguese or Spanish. Curry told witness that the answer was, "they might sink their brig, but he could not come on board." Nunez then told us to lower our boat and go on board the strange brig; Curry, Crocker, the second mate, Peter Roberts, (Martin,) John Gray, and Dill or Smith, then went on board the stranger; Curry and Crocker had each a pair of pistols, they were buckled in a belt

round their bodies; our boat returned in about three quarters of an hour with Curry and the captain of the strange brig, and three of her men; Curry and the captain came on board the Malek Adhel, the men remained in their boat alongside; the strange captain gave Nunez a tin box with the ship's papers, I believe; ship's papers are carried in such boxes. Curry and Captain Nunez took them down below; strange captain remained on deck; I saw them down the companion-way, examining the papers in the cabin; they had them about a quarter of an hour, and then brought them up and gave them to the Portuguese captain; Nunez spoke English and told Curry to tell strange captain he must pay twenty dollars for the shot Nunez had fired at him, and ten dollars for a keg of oil which had been knocked over by the recoil of the gun. Nunez also told Curry in English to look and see if there were any guns and powder on board the other vessel, and if there were any, to spike the guns and bring the powder on board, and see if any sweetmeats were on board, and bring them on board also; they then shoved off, Curry with them, and went to the Portuguese vessel; Nunez told me that the Portuguese vessel was from Rio Grande, bound to Oporto, with a cargo of hides and horns; in half an hour after our boat returned with those who originally went on board the Portuguese vessel, and brought a jar of sweetmeats, one dog, and twenty dollars for the shot; after the boat was secured Captain Nunez put me on duty again; this was two o'clock in the morning; Curry told me he had got twenty dollars for the shot, but was ashamed to ask for the other ten for the oil; I saw Curry give the captain the money in Spanish dollars; Curry said he wouldn't take Brazilian money, which was first offered him by the Portuguese captain; after that we left the vessel and proceeded on our course. The next vessel we met was on the 10th or 12th of August; they were standing to northward, we to southward; when she came abeam of us, she tacked ship and went in the same direction with us; in about two hours after we hove our maintop back and ran foul of each other; Captain Nunez got enraged and told them to shot the gun and fire at the stranger; it was done; we fired a second shot; Nunez ordered the second shot.

When the first shot was fired, we were within close hailing distance; and also, when each shot was fired; we fired five times, gun shotted each time. After the fifth fire all our powder was gone: Nunez then told Martin something witness did not understand, and Martin then told the crew, he (Captain Nunez) said he would give

$500 to any volunteers of his crew, who would go and bring the captain aboard. Nunez asked me to go. I told him, I did not like it. He told me not to be afraid, and gave me his dirk; I threw the dirk down on the deck, and said to Nunez, I was afraid to go on board with the boat, for fear they would throw something in the long boat and sink her, when we were alongside. Nunez said, he wanted to bring the other captain on board the Malek, and give him twenty-five lashes; we were then some distance astern. Nunez told Martin to take two men, Dell and Helm, and go on board; they did so, and remained half an hour; they returned and brought back with them the time. I saw one shot go through the flying jib; it was the second shot. When Martin came back, he told Nunez he must send his chronometer with an officer, and rate it; I took the chronometer, went on board the other vessel, and rated it. Strange captain asked me why Nunez had fired at him; I said I did not know; the captain had ordered it. He asked me where we were bound. I said, "God only knows." When I returned to the Malek Adhel, I told Nunez what had happened, and he laughed. The strange brig was the "Albert;" she was an English brig and bound to Rio; her stern sign was disfigured; she had English colours flying. We then proceeded on our course, and made the Brazils about the 20th or 21st of August; the land was some miles north of Cape Antonio. The passengers on board told me they were to go to Bahia. We got to Bahia about six o'clock in the evening, and Curry, Silvie, and the captain went ashore. They came on board again about nine o'clock next morning, and Nunez told me to make ready to clear the cargo; as he was going to repair his vessel. Nunez stayed about half an hour on board and went ashore again. Next morning got all clear, and about half-past eleven Nunez came on board; the men told me they would do no more work until they saw the American consul; this was told me before Nunez came on board; when he came, I told him; he asked me if I wanted to see the consul too. I said, "Yes." He then said, "Very well, I will go ashore and see." He went on shore, and the next morning between nine and ten o'clock, he came on board again. He told me to tell all the crew, who wanted to see the consul, to come aft, and go on the larboard side; the whole crew went on the larboard side, Martin among them. The second mate, Mr. Crocker, and four or five men, went on shore that day; they stayed on shore until about three o'clock, and then returned. Captain Nunez came on board

the next morning, and told me the consul wanted to see me, and that I must go on shore with him. We went to the consul's office, and he asked me about these charges. I had kept an account of some small transactions on a piece of paper; I gave it to the consul. The captain said I could be discharged, if I desired it; but the consul said, "Not until the affair was settled." By small transactions, witness means the firing, &c. Captain Nunez admitted that it was all right, as I had put it down. I told the American consul the same story as I am now telling. When we were going ashore, Nunez said, "Suppose I sell the brig, how much she worth?" He also said one man had offered to give him $22,000 for her. I told him I did not know how much she was worth. I stayed on shore until two o'clock, and then went on board again; that night, about one or two o'clock, a vessel ran foul of us, and tore away our jib-boom. The next morning while we were repairing it, the captain came on board and told me the consul wanted to see me. I went, returned afterwards on board, got my clothes and went ashore, where I remained nine or ten days; went on board, afterwards, the American brig Yankee, and remained there until the Enterprize, a United States schooner, seized and took the Malek and her crew. There were four men shipped by the captain at Bahia, after I left the brig; they were one Portuguese, one Spaniard, one English, and one American. The crew were examined in succession by the consul. We left Bahia on the 26th September, under the charge of Lieut. Drayton, on board the brig; nine men and two officers were put on board; we then went to Rio; four of our crew were from the schooner Enterprize; we left Martin and the cook behind at Bahia. The day I returned from the consul's on board the Malek, Nunez and the cook had a quarrel, and Nunez struck the cook; cook said, "When I shipped, I did not know I shipped on board a slaver." I saw Captain Nunez at Rio, in prison. We stayed at Rio from the 2d of October until the 1st of March. We were taken before the authorities at Rio; they let the captain out of prison. I saw him afterward walking about in Rio. I left Rio in the Malek, under the command of Lieut. Ogden, and with the crew who are now in prison, where we have been since we arrived. Lieut. Ogden had on board, besides ourselves, four men and one midshipman. I kept the log-book of the Malek; Captain Nunez got it from me, to take it to the consul the day we went before him. It was laid before the consul, and I never saw it afterwards. The log-book contained some of the

particulars about the firing. (Here a book is shown to the witness.) This book was kept by the captain. Lieut. Drayton kept a log-book from Bahia to Rio.

### Cross-Examination.

Upon cross-examination, the witness further deposed: While I was on board the Yankee, a midshipman and four men came on board and ordered me on board the schooner Enterprize. I was not imprisoned at Bahia. Peter Roberts (Martin) was among the men who went on the larboard side. I do not know whether the pistols Gurry carried were loaded or not; one pistol out of the four was loaded, I know. The men who accompanied Curry were unarmed, to the best of my knowledge. The Albert answered the hail of the Malek Adhel. Our brig had her name on the stern. I saw Curry put the money down on the cabin table. I did not tell any one I had seen the money counted out. On my examination at Bahia, I stated that Curry had told me that he had received the money. I do not recollect whether I stated then that I saw it. The cook's deposition was not taken, that I know of. Silvie and the boy were in the cabin with Nunez and Curry. I am from Philadelphia, but have sailed out of New York for the last five years. Have sailed as mate twice before. Before the offer of $500, made by Nunez to his crew to board the Albert, he had not ordered the crew, nor had they refused to go.

### Further Cross-Examination of John Myers.

John Myers, upon his further cross-examination, deposed as follows:—

We left Captain Nunez at Bahia. When we first arrived at Rio, I did not see him. The second time I went ashore I saw him in jail. I do not know how long he remained in jail. We remained at Rio four months. I never saw Nunez after the frigate Potomac arrived. The Enterprize and the Malek Adhel went into Rio together. Nunez was at liberty on shore after the Enterprize arrived. I saw Nunez three or four days before we sailed from Rio; he told me he was going to take command again of the Malek Adhel. Martin went with the rest of the crew before the consul. I saw him in the consul's office. I never saw Martin at Rio; we left him at Bahia. I saw both Curry and Silvie at Rio, but do not know how they got there. A vessel bound direct from Bahia to Guayamas would not stop at Rio. I did not see either Curry or Silvie after the Poto-

mac arrived. I should think the Potomac was at Rio twelve or fifteen days before we sailed for home.

At November term, 1841, the Circuit Court affirmed the decree of the District Court, dismissed the appeals, and ordered each party to pay their respective costs in that court. Both parties appealed to the Supreme Court.

*Z. Collins Lee,* and *R. Johnson,* for the United States.
*Meredith,* and *Nelson,* (attorney-general,) for the claimants.

*Lee,* made the following points on behalf of the United States, as appellants :—

1st. That the cargo of the said vessel was subject to forfeiture, and ought to have been condemned; and the decree, so far as regards it, ought to be reversed.

2d. That no part of the costs and expenses incurred in the prosecution should be paid out of the proceeds of the property condemned; but that Peter Harmony and Co. should be decreed to pay the same.

And on behalf of the United States, as appellees,

3d. That the Malek Adhel, her tackle, apparel, and furniture, were properly condemned; and that the decree, so far as regards them, ought to be affirmed.

*Lee* argued that the brig was "an armed vessel, or a vessel of which the crew were armed" within the true meaning and intent of the act of Congress of the 3d March, 1819, 3 Story's Laws, p. 1738; the 1, 2, 3, and 4 sects. of which were continued by the act of 15th May, 1820, 3 Story, 1798, and afterwards without limitation by the act of 30th January, 1823, 3 Story, 1874. And in the second place, that from the evidence exhibited on the record, the aggressions, restraints, and depredations proved were "piratical" and such as the act of Congress contemplated and intended to punish.

And lastly, that, assuming the said brig not to be "an armed vessel" within the meaning of the act, yet the aggressions and depredations perpetrated on the Portuguese vessel were, according to the law of nations, piratical.

To sustain the above propositions he referred to the following authorities :—

Act of Congress of 1790, ch. 36, 1 Story, 82, defining piracy.

Act of 1825, ch. 276, 3 Story, 1999, defining and punishing as piratical certain offences therein named.

United States *v.* Brig Malek Adhel.

Also, to the following cases:—

United States *v.* Palmer, 3 Wheat. 610; p. 626, as to the construction of the act of 1790; The Marianna Flora, 11 Wheat. 37; and to show that a single piratical act is sufficient, referred to the speech of Chief Justice Marshall in the case of Jonathan Robbins, reported in the appendix to 5 Wheat. p. 8, 12; 3 Wash. C. C. R. 221, 214, case of United States *v.* John Jones; 5 Wheat. 145, 149, 153, and notes; 5 Wheat. 412, 192; 2 Azuni, 351; 4 Bla. Com. 72, defining sea-robbery; 2 East, Pleas, 707; Vattel, ch. 15, sect. 226; Grotius, ch. 15, sect. 85; Molloy, 57.

Upon the question of the forfeiture of the cargo:—

Dodson Adm. Rep. 470; case of The Neptune, 5 Robinson and Wheaton on Captures; 1 Haggard, 142, case of the Hallen; 3 Dallas 133, case of the Adams, and commented on the opinion of the court in the case of the Marianna Flora, 11 Wheaton.

*Meredith,* for the claimants,

There are two questions in the case.

1. The construction of the act of Congress.

2. The bearing of the evidence.

The innocence of the owners is admitted on the record. They were sole owners during all the voyage, and engaged in a lawful trade. The vessel was properly equipped for such a voyage, and the owners had nothing to do with the acts complained of. These admissions were not gratuitous but proved, and placed in this form for convenience.

Does the act of 1819 reach such a case? She was armed only as the voyage required, and the captain departed from the orders of the owners. It is an important question, because, if decided in the affirmative, the risks of ship-owners will be increased, and in violation of the natural principles of justice.

It is an open question. Some expressions of opinion by the court in the case of the Marianna Flora appear to incline to the construction of the other side, but there is no decision in any case. The only question there was one of damages; the claim of forfeiture was abandoned by the captors and by the United States. There was nothing to call for an opinion as to the construction of the act of 1819. The passage quoted by the opposite counsel was in answer to an argument used at bar that there was nothing suspicious in the case; but there has been no adjudication upon the point.

If the act of 1819 includes the case of an innocent owner, it must be because,

1. That such owner was liable under the maritime law, or
2. That Congress intended to extend that law.

1. As to maritime law.

The owner, if liable, must be so *in personam* or *in rem*.

His liability *in personam*, although varying in some particulars, is mainly the same with the liability of an employer at common law. The master is his agent. In civil cases the captain can sometimes bind his owner to a greater degree than other agents can, but not for torts. The owner is always responsible for the negligence of his agent in acts done within the scope of his authority, but not where the act is wilful and beyond the authority. And this is equally true whether the agent was or was not engaged at the time about the business of his principal.

The whole law is collected in Story on Agency, 456. See also Skinner's Reports, 228; 1 East, 106; 4 Barnewall and Alderson, 592; 19 Wendell, 343, cases collected; 1 Hill's Reports, 480.

These cases show that the owner is responsible for negligence or unskilfulness, but not for wilful torts.

The maritime law has the same rule. 8 T. R. 533; Story on Agency, 327, sect. 319; Curtis, 195 note, 205 note; 1 Taunton, 567; Ingersoll's Roccus, 23, notes 11, 12, 13, 15; Salkeld, 282; 19 Johnson, 235, referred to in Story's Abbot, 19; 2 Brown's Admiralty Law, 140.

Is the owner bound *in rem?*

It would be contrary to reason and justice to hold him so. If he is not bound in damages, why is his vessel responsible? There is no moral delinquency in the owner. The ship, it is true, is considered sometimes as the offender, but only when something is done for which the owner is responsible, either for his own acts or those of his agent acting within the scope of his authority. 2 Brown's Admiralty, 142, 143.

The torts of the master cannot hypothecate the ship; she is seized only until the captain gives bail. Abbott, 99, note 1; same principle, Duponceau's Bynkershoek, ch. 18, p. 129, 150, 151, 152, 154.

In prize cases there is no forfeiture except on the presumed liability of the owner. The modern doctrine is that contraband does not affect the ship, or even cargo, if it is put on board without the knowledge of the owner, even by the captain.

Bynckershoek, ch. 12, p. 93, says, that if the owner knows of it, or the captain is executing the orders of the owner, the vessel is forfeited—otherwise not.   See also 1 Rob. Ad. Rep. 67—70, 104, 130 ; 3 Rob. Ad. Rep. 143, 178.

The owner is not responsible in damages where the vessel becomes a pirate.   3 Wash. C. C. R. 262, was a case of a privateer, where the owner's bond was liable and ship too, because of an understood contract to that effect between the government and all privateers ; but not so as to other vessels.

A piratical capture does not divest the owner of his property. 1 Molloy, 88, sect. 31, book 1, ch. 4 ; 1 Robinson, 81, 229 ; 6 Robinson, 229 ; 1 Beawes's Lex Mercatoria, 6th ed. 364 ; 1 Rolle's Rep. 285.

Did Congress intend to extend the provisions of the maritime law ?

Before saying so, the court will look to the injustice of such a construction, and its dangerous consequences to ship-owners.   The act was not intended to repair private losses, but to punish crimes ; and such a construction will punish one man for offences committed by another.

The state of the country when the act was passed was referred to by the other side, to illustrate its meaning.   It was shortly after a general peace, except as to South America.   Sailors were discharged from navies ; privateers abounded, and the transition was easy to piracy.   In all the cases in this court, the vessels had been privateers.   The act, therefore, did not contemplate merchant vessels armed for defence, but ships fitted out as privateers.   The vessel is confiscated by the act, but there is a singular omission as to the cargo. Why not include it, if merchant vessels were embraced by the act. The omission was intentional, because on the same day an act was passed to suppress the slave trade, in which the cargo is forfeited as well as the ship.   In 5. Wheat. 338, the court were prepared to construe an act as we contend for ; the owners there were said to be innocent, because the ship was in the possession of piratical captors ; 5 Wheat. 352.   Yet the words of that act were as peremptory for that case as the act of 1819 is for ours.   In page 357, the court say, that the vessel would have been restored if she was in possession of piratical captors, because the owners would have been innocent.

In 13 State Trials, Dawson's case, taking the vessel from the owners was itself held to be an act of piracy.

2. What is the bearing of the evidence ?

The offences of " aggression, search," &c., must be " piratical."

that is, with an intention to commit piracy; not piracy under the law of 1790, but under the law of nations, because it punishes the vessels of other nations as well as our own, and the last section refers to piracy under the law of nations, which is sea-robbery, forcible depredation at sea, *animo furandi.* At common law there is no piracy. The English statute did not change the nature of the offence, but only the mode of punishing it. Is there any proof of an intention to commit robbery? if not, the case is not within the act of Congress. There seems to have been a hallucination in the captain's mind, bordering on madness; wanted always to rate his chronometer. He had many opportunities to plunder, but did not; some vessels passed by, others were supplied with provisions. He did not think he had done wrong, because he permitted his crew to go freely to the American consul at Bahia, and would not take Brazilian dollars for the powder and oil which he had lost.

But the cargo is sought also to be condemned. At first the information contained only counts depending upon the act of Congress; two were afterwards added upon the law of nations, with a view of reaching the cargo. The capture itself was a harsh measure; the papers showed the ship to have been American property; the crew were faithful to their duty, and it would have been praiseworthy to have despatched her on her voyage, in charge of the mate. The protection of commerce does not require that the cargo in this case should be aimed at as well as the ship. The offence charged in these two counts is a "hostile aggression with intent to plunder." If this is piracy under the law of nations, it is merged in the act of 1819, but the offences charged are only misdemeanors. 2 Brown's Admiralty Rep. appendix, p. 519.

The Constitution gives Congress power to define and punish piracies and offences against the laws of nations. If Congress has not done it, this court cannot punish petty offences.

*Nelson,* attorney-general, on the same side, examined the facts in the case as disclosed by the record, and then commented on the acts of 1819, 1823, 1825, 1790, to show the history of the legislation upon the subject of piracy. The "restraints, aggressions," &c., must be "piratical," as that term is understood by the laws of nations. The 5th section of the act of 1819 declares that persons who commit piracy, as understood by the laws of nations, shall suffer death. The 8th section of the act of 1790 was said by the court, (5 Wheat.

184, 185, 202, 206,) not to be repealed; this decision was given on the 1st of March, 1820, and an act of Congress was passed immediately thereafter, (15th May, 1820,) the third section of which declared what should be piracy, (3 Story, 1798,) making robbery a necessary ingredient. The act of 1825, by implication, repeals the 8th sect. of the act of 1790, by declaring such offences to be felony. No person could be indicted under the acts of Congress as a pirate, because the act of 1825 says he shall be punished with death as a felon. The consequence is, that there is no piracy recognised by the laws of the United States, except that known to the law of nations, and the act of 1819 must be so construed. The offences charged in the five first counts under that act must, therefore, be shown to be piratical under the law of nations; that is, committed for the purposes of robbery. Does the evidence justify this? The court, acting as a jury, must acquit unless the affirmative be made out clearly. The acts of the captain are like those of an insane man.

[Mr. *Nelson* here commented on these acts, in the case of each vessel successively.]

In the case of the Palmyra, 12 Wheat. 15, it is said that a petty aggression is not a cause of condemnation, unless it indicates a bad mind.

Ought the vessel to be condemned?

There is no other law to condemn it except that of 1819. The policy of that law was to bear upon armed vessels, or the crews of which were armed. But neither branches of the alternative includes this case. The crew cannot be said to have been armed, within the meaning of the act, because the agreement says that the vessel had only ordinary equipments. All vessels going to the Pacific carry arms for defence. In the case of the Palmyra, the court said, a vessel might be armed for commercial purposes. So here. Why did not the act of 1819 include the cargo? because it struck at privateers who have no cargo. In all revenue laws, the cargo is condemned as well as the vessel.

If the acts of the master were piratical, that very fact protects the owners, because the first offence was against them in divesting them of their property and converting it to his own purposes. He was guilty of barratry, at least. Can the owners lose their property through an act of piracy? The 8th sect. of the act of 1790, makes it piracy to run away with a vessel or voluntarily give her up to a pirate. If this act be in force, the captain was a pirate. All the

cases say that piracy does not divest ownership. 5 Wheat. 338, 357, 358. There need not be personal violence in running away with a ship. 1 Gallison, 247, 253, 256. The proof here shows that the captain had been negotiating in Fayal for a sale of the vessel.

Ought the cargo to be condemned?

The act of 1819 clearly does not embrace the cargo, and there must be something more proved than an "aggression" or "restraint." The opposite counsel cannot proceed on a statute for half and the law of nations for the other half, because Congress has exercised its power in the premises. How does the law of nations reach the cargo of an unoffending owner. If the vessel be construed to be the offender, the cargo is not. In war, the cargo is condemned, but then different rules apply. The vessel must be taken *in delicto*.

The Marianna Flora, 11 Wheat. 40, 57, in which case the capturing vessel was attacked. But, here, the Enterprize was not.

As to costs—they are within the discretion of the court. Dunlap's Practice, 164; 2 Mason, 58; 4 Gallison, 414.

Costs cannot be appealed from. 3 Peters, 307, 319.

*R. Johnson*, for the United States, in reply.

There are three questions,

1. What is the true construction of the act of 1819, as to the vessel?

2. What is the law of nations as to the cargo?

3. Does the evidence show the ship to be within the act of Congress, and the cargo to be within the law of nations.

1. The act of Congress had two objects in view, first, to protect commerce; and second, to punish piracy personally. Piracy had been in part defined and punished by the act of 1790. That of 1819 was passed when commerce was suffering, and its object was to punish piracy up to the full extent of the law of nations; it is punished with death.

There are three objections made by the other side,

1. That the act does not cover the case of an innocent owner, but that the United States must always show that the owner was either a pirate himself or knowingly fitted out his vessel for such purposes.

2. That the vessel must be armed for "offensive purposes," and that the mere fact of being armed is not enough.

3. That the acts are not piratical, because it is not shown that they were done for the purposes of plunder.

1. As to the innocence of the owner. Must his guilt be established? The language of the act is "to protect merchant vessels from piratical aggressions and depredations," and the President is authorized to instruct officers to send in any armed vessel or crew which shall have attempted any piratical aggression upon an American vessel or any other. It is not their business to ask who is the owner; the fact is enough. It is said that the vessels must be fitted out for the purpose of depredating; but the history of the matter is, that the vessels intended to be reached were not so fitted out, but seized upon by the crews for piracy. The construction of the other side entirely defeats the object of protecting commerce. There are no words in the law relating to the owners; the vessel is declared to be the guilty thing. The only facts necessary to be proved are, that the vessel was armed, and that a piratical aggression was committed. Merchant vessels can aid in these captures. If Congress had intended to exempt the property of innocent owners, they would have left some discretion in the court; but the language is, the vessel shall be condemned. It is said to be unjust to punish the innocent for the guilty; but the object of Congress was to stop the crime by breaking up the means of committing it.

In the case of the Marianna Flora, this court said that innocence of owners was no excuse. This was not a mere dictum, as the opposite counsel have said, but a point in the case.

2d objection. That this vessel was not armed within the meaning of the act. The only fact which the law looks to, is, whether the vessel was armed at the time of committing the aggression. Here, both vessel and crew were armed. But it is said that the arms were put on board for an innocent voyage. True. But so it was in the case of the Marianna Flora, and the court said she might have committed an aggression within the meaning of the act. What difference does it make, when the object of the law is to protect commerce? It is not said what number of guns must be on board, or to what extent the crew must be armed. What the law regarded was, that neither should be so far armed as to be capable of injuring commerce. It is said that the aggression must be piracy as described in the 5th section; that it must amount to sea-robbery. But it is perfectly clear Congress did not intend this; they knew what piracy was, by the law of nations, and have declared that an "attempt" to commit a depredation shall be punished. A "search," "aggression" or "restraint" are all punishable; and these are all beyond the limits of

national law. These offences are not punished personally, but in the 5th section piracy is punished with death. The offences, there-fore, are not the same. In the case of the Palmyra, 12 Wheat. 14, 15, it was argued that the vessel could not be condemned until the per-son was convicted; but the court said it was not necessary, because there was no personal punishment provided in the sections against restraint, &c. There is something more meant, therefore, than piracy at common law. There need not be robbery; a "restraint" is enough. In the 3d section, where merchant vessels are authorized to capture, the word "piratical" is dropped; the act meant to pro-tect against all aggressions, and considered them all as piratical.

[Mr. *Johnson* here examined the cases of aggression *seriatim.*]

3d objection. That the acts were not piratical, because it is not shown that they were committed for the sake of plunder. But the amount is not material in a question of robbery, and violence threat-ened is as criminal as if used; and it was argued on the other side, that there was sufficient evidence to show that the captain had run away with the ship, which was piracy. The money was paid by the Portuguese vessel under fear. The boarding party was armed with pistols and a dirk. Fear was purposely instilled, or why did the captain send his men armed. The firing into the other vessels was wilful and malicious. In the Marianna Flora, the court said, if death had ensued from firing, it would have been a grave inquiry whether some greater punishment should not be inflicted, although it was under a mistake.

2d point. What is the law of nations as to the cargo? Did it originally cover the case; and if so, has it been abrogated by Con-gress?

Where a party roves the sea to commit murder and get gain by violence, is at war with the whole world; and when his property is seized, a right of condemnation ensues as in the case of other ene-mies' property. But it is objected that this cargo is the property of innocent persons. The answer is, that the same motives which induced the act of 1819 to give the vessel to the captors, induces the law of nations to give them the cargo also. Nor has this rule been changed by legislation. In the case of United States *v.* Smith, 5 Wheaton, the court say that the 8th section of the 1st article of the Constitution, giving power to Congress to define and punish piracies and offences against the law of nations, includes the power of punish-ing lesser offences than piracy. Congress did not intend, by the act

of 1819, to take away any of the admiralty jurisdiction which had previously been vested in the judiciary. We must resort to the law of nations. The power to "define and punish" means to inflict personal punishment, and the jurisdiction of admiralty is always *in rem*. It is untouched by the law. If a pirate were to claim a cargo, would a court give it to him? and yet the court can only condemn or restore. Admiralty law gives to the captors the property in the thing captured; and if the vessel be condemned, what can save the cargo? the same reason applies to both, which is, holding out an inducement to captors to be vigilant. If the captain were the owner of both ship and cargo, would the court condemn his vessel and restore his cargo? In 11 Wheaton, before cited, the owner of the ship is held responsible for the acts of the agent, and what good reason can be given why the owner of the cargo should not also be so, especially when he is the same person who owns the ship.

Mr. Justice STORY delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the district of Maryland, sitting in admiralty, and affirming a decree of the District Court rendered upon an information *in rem*, upon a seizure brought for a supposed violation of the act of the 3d of March, 1819, ch. 75, (ch. 200,) to protect the commerce of the United States, and to punish the crime of piracy. The information originally contained five counts, each asserting a piratical aggression and restraint on the high seas upon a different vessel: one, the Madras, belonging to British subjects; another, the Sullivan, belonging to American citizens; another, the Emily Wilder, belonging to American citizens; another, the Albert, belonging to British subjects; and another upon a vessel whose name was unknown, belonging to Portuguese subjects; and this last count contained also an allegation of a piratical depredation. The Malek Adhel and cargo were claimed by the firm of Peter Harmony and Co., of New York, as their property, and the answer denied the whole gravamen of the information. At the hearing in the District Court, the vessel was condemned and the cargo acquitted, and the costs were directed to be a charge upon the property condemned. An appeal was taken by both parties to the Circuit Court; and upon leave obtained, two additional counts were there filed, one alleging a piratical aggression, restraint, and depredation upon a vessel belonging to Portuguese subjects, whose name was unknown, in a hostile manner and with intent to destroy

U

and plunder the vessel, in violation of the law of nations; and another alleging an aggression by discharge of cannon and restraint upon a British vessel called the Alert, or the Albert, in a hostile manner, and with intent to sink and destroy the same vessel, in violation of the law of nations. Upon the hearing of the cause in the Circuit Court, the decree of the District Court was affirmed; and from that decree an appeal has been taken by both parties to this court.

It was fully admitted in the court below, that the owners of the brig and cargo never contemplated or authorized the acts complained of; that the brig was bound on an innocent commercial voyage from New York to Guayamas, in California; and that the equipments on board were the usual equipments for such a voyage. It appears from the evidence that the brig sailed from the port of New York on the 30th of June, 1840, under the command of one Joseph Nunez, armed with a cannon and ammunition, and with pistols and daggers on board. The acts of aggression complained of, were committed at different times under false pretences, and wantonly and wilfully without provocation or justification, between the 6th of July, 1840, and the 20th of August, 1840, when the brig arrived at Bahia; where, in consequence of the information given to the American consul by the crew, the brig was seized by the United States ship Enterprize, then at that port, and carried to Rio Janeiro, and from thence brought to the United States.

The general facts are fully stated in a deposition of one John Myers, the first mate of the Malek Adhel; and his testimony is corroborated by the other evidence in the cause, in its main outlines and details. The narrative, although long, cannot be better given than in his own words. He says, among other things, " On Tuesday, the 30th of June," [Here the judge read a part of the evidence of Myers, which is set forth in the statement of the case by the reporter.]

Now upon this posture of the case, it has been contended, 1st. That the brig was not an armed vessel in the sense of the act of Congress of 1819, ch. 75, (ch. 200.) 2. That the aggressions, restraints, and depredations disclosed in the evidence were not piratical within the sense of the act. 3. That if the case in both respects is brought within the scope of the act, still neither the brig nor the cargo are liable to condemnation, because the owners neither participated in nor authorized the piratical acts, but are entirely innocent thereof. 4. That if the brig is so liable to condemnation, the cargo is not, either under the act of Congress or by the law of nations.

We shall address ourselves accordingly to the consideration of each of these grounds of defence. The act of 1819, ch, 75, (ch. 200,) provides, in the first section, that the President is authorized and requested to employ the public armed ships of the United States with suitable instructions "in protecting the merchant ships of the United States and their crews from piratical aggressions and depredations." By the second section the commanders of such armed vessels are authorized "to subdue, seize, take, and send into any port of the United States any armed vessel or boat, or any vessel or boat the crew whereof shall be armed, and which shall have attempted or committed any piratical aggression, search, restraint, depredation, or seizure upon any vessel of the United States, or of the citizens of the United States, or upon any other vessel," &c. By the third section it is provided "that the commander and crew of any merchant vessel owned wholly or in part by a citizen thereof, may oppose and defend against any aggression, search, restraint, depredation, or seizure, which shall be attempted upon such vessel, or upon any other vessel owned as aforesaid, by the commander or crew of any other armed vessel whatsoever, not being a public armed vessel of some nation in amity with the United States, and may subdue and capture the same," &c. Then comes the fourth section, (upon which the five counts of the original information are founded,) which is as follows, "That whenever any vessel or boat from which any piratical aggression, search, restraint, depredation, or seizure shall have been first attempted or made, shall be captured and brought into any port of the United States, the same shall and may be adjudged and condemned to their use and that of the captors, after due process and trial in any court having admiralty jurisdiction, and which shall be holden for the district into which such captured vessel shall be brought; and the same court shall thereupon order a sale and distribution thereof accordingly, and at their discretion." The fifth section declares, that any person who shall on the high seas commit the crime of piracy as defined by the law of nations, shall, upon conviction thereof, be punished with death.

Such are the provisions of the act of 1819, ch. 75, (ch. 200.) And it appears to us exceedingly clear, that the Malek Adhel is an "armed vessel" within the true intent and meaning of the act. No distinction is taken, or even suggested in the act, as to the objects, or purposes, or character of the armament, whether it be for offence or defence, legitimate or illegitimate. The policy as well as the words

of the act equally extend to all armed vessels which commit the unlawful acts specified therein. And there is no ground, either of principle or authority, upon which we are at liberty to extract the present case from the operation of the act.

The next question is whether the acts complained of are piratical within the sense and purview of the act. The argument for the claimants seems to suppose, that the act does not intend to punish any aggression, which, if carried into complete execution, would not amount to positive piracy in contemplation of law. That it must be mainly, if not exclusively, done *animo furandi*, or *lucri causa ;* and that it must unequivocally demonstrate that the aggression is with a view to plunder, and not for any other purpose, however hostile or atrocious or indispensable such purpose may be. We cannot adopt any such narrow and limited interpretation of the words of the act; and in our judgment it would manifestly defeat the objects and policy of the act, which seems designed to carry into effect the general law of nations on the same subject in a just and appropriate manner. Where the act uses the word "piratical," it does so in a general sense; importing that the aggression is unauthorized by the law of nations, hostile in its character, wanton and criminal in its commission, and utterly without any sanction from any public authority or sovereign power. In short, it means that the act belongs to the class of offences which pirates are in the habit of perpetrating, whether they do it for purposes of plunder, or for purposes of hatred, revenge, or wanton abuse of power. A pirate is deemed, and properly deemed, *hostis humani generis.* But why is he so deemed? Because he commits hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretence of public authority. If he wilfully sinks or destroys an innocent merchant ship, without any other object than to gratify his lawless appetite for mischief, it is just as much a piratical aggression, in the sense of the law of nations, and of the act of Congress, as if he did it solely and exclusively for the sake of plunder, *lucri causa* The law looks to it as an act of hostility, and being committed by a vessel not commissioned and engaged in lawful warfare, it treats it as the act of a pirate, and of one who is emphatically *hostis humani generis* We think that the aggressions established by the evidence bring the case completely within the prohibitions of the act; and if an intent to plunder were necessary to be established, (as we think it is not,) the acts of aggression and hostility and plunder committed on the

Portuguese vessel are sufficient to establish the fact of an open although petty plunderage.

Besides, the argument interprets the act of Congress as though it contained only the word " depredation," or at least coupled aggression and depredation as concurrent and essential circumstances to bring the case within the penal enactment of the law. But the act has no such limitations or qualifications. It punishes any piratical aggression or piratical search, or piratical restraint, or piratical seizure, as well as a piratical depredation. Either is sufficient. The search or restraint may be piratical although no plunder follows, or is found worth carrying away. What Captain Nunez designed under his false and hollow pretences and excuses it may not be easy to say, with exact confidence or certainty. It may have been to train his crew to acts of wanton and piratical mischief, or to seduce them into piratical enterprises. It may have been from a reckless and wanton abuse of power, to gratify his own lawless passions. It could scarcely have been from mental hallucinations; for there was too much method in his mad projects to leave any doubt that there was cunning and craft and worldly wisdom in his course, and that he meditated more than he chose to explain to his crew. They never suspected or accused him of insanity, although they did of purposes of fraud.

The next question is, whether the innocence of the owners can withdraw the ship from the penalty of confiscation under the act of Congress. Here, again, it may be remarked that the act makes no exception whatsoever, whether the aggression be with or without the co-operation of the owners. The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. The vessel or boat (says the act of Congress) from which such piratical aggression, &c., shall have been first attempted or made shall be condemned. Nor is there any thing new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offence has been done as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party. The doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws; and has

been applied to other kindred cases, such as cases arising on embargo and non-intercourse acts. In short, the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs. In the case of the United States v. The Schooner Little Charles, 1 Brock. Rep. 347, 354, a case arising under the embargo laws, the same argument which has been addressed to us, was upon that occasion add essed to Mr. Chief Justice Marshall. The learned judge, in reply, said: " This is not a proceeding against the owner; it is a proceeding against the vessel for an offence committed by the vessel; which is not the less an offence, and does not the less subject her to forfeiture because it was committed without the authority and against the will of the owner. It is true that inanimate matter can commit no offence. But this body is animated and put in action by the crew, who are guided by the master. The vessel acts and speaks by the master. She reports herself by the master. It is therefore not unreasonable that the vessel should be affected by this report." The same doctrine was held by this court in the case of the Palmyra, 12 Wheat. R. 1, 14, where referring to seizures in revenue causes, it was said: " The thing is here primarily considered as the offender, or rather the offence is primarily attached to the thing; and this whether the offence be *malum prohibitum* or *malum in re*. The same thing applies to proceeding *in rem* or seizures in the Admiralty." The same doctrine has been fully recognised in the High Court of Admiralty in England, as is sufficiently apparent from the Vrow Judith, 1 Rob. R. 150; the Adonis, 5 Rob. R. 256; the Mars, 6 Rob. R. 87, and indeed in many other cases, where the owner of the ship has been held bound by the acts of the master, whether he was ignorant thereof or not.(a)

The ship is also by the general maritime law held responsible for the torts and misconduct of the master and crew thereof, whether arising from negligence or a wilful disregard of duty; as for example, in cases of collision and other wrongs done upon the high seas or elsewhere within the admiralty and maritime jurisdiction, upon the general policy of that law, which looks to the instrument itself, used as the means of the mischief, as the best and surest pledge for the compensation and indemnity to the injured party.

(a) See 3 Wheaton's Rep., Appendix, p. 37 to p. 40.

The act of Congress has therefore done nothing more on this point than to affirm and enforce the general principles of the maritime law and of the law of nations.

The remaining question is, whether the cargo is involved in the same fate as the ship. In respect to the forfeiture under the act of 1819, it is plain that the cargo stands upon a very different ground from that of the ship. Nothing is said in relation to the condemnation of the cargo in the fourth section of the act; and in the silence of any expression of the legislature, in the case of provisions confessedly penal, it ought not to be presumed that their intention exceeded their language. We have no right to presume that the policy of the act reached beyond the condemnation of the offending vessel.

The argument, then, which seeks condemnation of the cargo, must rely solely and exclusively for its support upon the sixth and seventh counts, founded upon the law of nations and the general maritime law. So far as the general maritime law applies to torts or injuries committed on the high seas and within the admiralty jurisdiction, the general rule is, not forfeiture of the offending property; but compensation to the full extent of all damages sustained or reasonably allowable, to be enforced by a proceeding therefor *in rem* or *in personam.* It is true that the law of nations goes in many cases much farther, and inflicts the penalty of confiscation for very gross and wanton violations of duty. But, then, it limits the penalty to cases of extraordinary turpitude or violence. For petty misconduct, or petty plunderage, or petty neglect of duty, it contents itself with the mitigated rule of compensation in damages. Such was the doctrine recognised by this court in the case of the Marianna Flora, 11 Wheat. R. 1, 40, where an attempt was made to inflict the penalty of confiscation for an asserted (but not proved) piratical or hostile aggression. Upon that occasion, the court said: "The other count" (which was similar to those now under our consideration) "which seeks condemnation on the ground of an asserted hostile aggression, admits of a similar answer. It proceeds upon the principle that, for gross violations of the law of nations on the high seas, the penalty of confiscation may be properly inflicted upon the offending property. Supposing the general rule to be so in ordinary cases of property taken *in delicto*, it is not, therefore, to be admitted, that every offence, however small, however done under a mistake of rights, or for purposes wholly defensive, is to be visited with such harsh punishments. Whatever

may be the case, where a gross, fraudulent, and unprovoked attack is made by one vessel upon another upon the sea, which is attended with grievous loss or injury, such effects are not to be attributed to lighter faults or common negligence. It may be just in such cases to award to the injured party full compensation for his actual loss and damage ; but the infliction of any forfeiture beyond this does not seem to be pressed by any considerations derived from public law." And the court afterwards added : "And a piratical aggression by an armed vessel sailing under the regular flag of any nation, may be justly subjected to the penalty of confiscation for such a gross breach of the law of nations. But every hostile attack in a time of peace is not necessarily piratical. It may be by mistake or in necessary self-defence, or to repel a supposed meditated attack by pirates. It may be justifiable, and then no blame attaches to the act ; or it may be without any just excuse, and then it carries responsibility in damages. If it proceed farther, if it be an attack from revenge or malignity, from a gross abuse of power, and a settled purpose of mischief, then it assumes the character of a private unauthorized war, and may be punished by all the penalties which the law of nations can properly administer ;" that is, (as the context shows,) confiscation and forfeiture of the offending vessel.

Now, it is impossible to read this language and not to feel that it directly applies to the present case. In the first place, it shows, that the offending vessel may, by the law of nations, in the case supposed of an attack from malignity, from a gross abuse of power, and a settled purpose of mischief, be justly subjected to forfeiture. But it is as clear that the language is solely addressed to the offending vessel and was not intended as of course to embrace the cargo, even if it belonged to the same owner, and he did not participate in or authorize the offensive aggression. For the court afterwards, in another part of the case, where the subject of the cargo was directly under consideration said, "But the second count" (founded on the law of nations) "embraces a wider range ; and if it had been proved in its aggravated extent, it does not necessarily follow that the cargo ought to be exempted. That is a question which would require grave deliberation. It is in general true that the act of the master does not bind the innocent owner of the cargo ; but the rule is not of universal application. And where the master is also agent and the owner of the cargo, or both ship and cargo belong to the same person, a distinction may, perhaps, arise in the principle of decision." So that the

United States v. Brig Malek Adhel.

court studiously avoided giving a conclusive opinion upon this point. Looking to the authorities upon this subject, we shall find that the cargo is not generally deemed to be involved in the same confiscation as the ship, unless the owner thereof co-operates in or authorizes the unlawful act. There are exceptions founded in the policy of nations, and as it were the necessities of enforcing belligerent rights against fraudulent evasions, where a more strict rule is enforced and the cargo follows the fate of the ship. But these exceptions stand upon peculiar grounds, and will be found, upon a close examination, to be consistent with, and distinguishable from, the general principle above suggested. Many of the authorities upon this subject have been cited at the bar, and others will be found copiously collected in a note in the appendix to the 2d vol. of Wheat. Rep. p. 37—40.

The present case seems to us fairly to fall within the general principle of exempting the cargo. The owners are confessedly innocent of all intentional or meditated wrong. They are free from any imputation of guilt, and every suspicion of connivance with the master in his hostile acts and wanton misconduct. Unless, then, there were some stubborn rule, which, upon clear grounds of public policy, required the penalty of confiscation to extend to the cargo, we should be unwilling to enforce it. We know of no such rule. On the contrary, the act of Congress, pointing out, as it does, in this very case, a limitation of the penalty of confiscation to the vessel alone, satisfies our minds that the public policy of our government in cases of this nature is not intended to embrace the cargo. It is satisfied by attaching the penalty to the offending vessel, as all that public justice and a just regard to private rights require. For these reasons, we are of opinion that the decrees condemning the vessel and restoring the cargo, rendered in both the courts below, ought to be affirmed.

There remains then, only the consideration of the costs, whether the courts below did right in making them exclusively a charge upon the proceeds of the condemned property. Costs in the admiralty are in the sound discretion of the court; and no appellate court should ordinarily interfere with that discretion, unless under peculiar circumstances. Here, no such circumstances occur. The matter of costs is not *per se* the proper subject of an appeal; but it can be taken notice of only incidentally as connected with the principal decree, when the correctness of the latter is directly before the court. In the present case the cargo was acquitted, and there is no ground to im-

pute any fault to it. If it had been owned by a third person, there would have been no reason for mulcting the owner in costs, under circumstances like the present, where it was impracticable to separate the cargo from the vessel by any delivery thereof, unless in a foreign port, and no peculiar cause of suspicion attached thereto. Its belonging to the same owner might justify its being brought in and subjected to judicial examination and inquiry, as a case where there was probable cause for the seizure and detention. But there it stopped. The innocence of the owner has been fully established; the vessel has been subjected to condemnation, and the fund is amply sufficient to indemnify the captors for all their costs and charges. We see no reason why the innocent cargo, under such circumstances, should be loaded with any cumulative burdens.

Upon the whole, we are all of opinion that the decree of the Circuit Court ought to be, and it is affirmed, without costs.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maryland, and was argued by counsel. On consideration whereof, It is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby affirmed, without costs.