THE BULLEY.

(District Court, S. D. New York. May 9, 1905.)

SHIPPING—LIABILITY OF VESSEL—TORTS OF MASTER AND CREW.
    A vessel is liable for a tortious act of her master or a member of her crew on board in her service by which another vessel is injured, although committed without the authority or knowledge of the owners.
    [Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 346.]

In Admiralty.

De Lagnel Berier, for libellant.
Carpenter, Park & Symmers, for claimant.

ADAMS, District Judge. This action was brought by Daniel McCarron, the owner of the steamtug William C. Nicoll, to recover for damages sustained by that tug by reason of a tortious act of the steamtug Bulley.

The cause of action is stated in the libel as follows:

"Second: That on the 16th day of January, 1905, between 5 and 6 o'clock in the forenoon the said tug 'William C. Nicoll' was lying tied up to the bulk-

head in a slip at the foot of Morris Street, Jersey City. That said tug was without steam at the time and that only one member of her crew was on board and in charge of said tug. That at the time aforesaid, the steam tug Bulley came into the said slip under her own steam and her master or some person in charge of her requested the man in charge of your libellant's steam tug to move the 'William C. Nicoll' and give way to the steam tug 'Bulley.' That the man in charge of the Nicoll declined to do so: first, because it was a public dock where the Nicoll was lying and where she had a right to be, and second: because the Nicoll was without steam or motive power of her own and was unable to move. That the 'Bulley' was equipped with a low pressure boiler and that it is customary when such boilers are to be cleaned to put into them a large quantity of soda and then to blow off the water and steam from the boiler. Upon information and belief your libellant alleges that the 'Bulley' had, prior to coming in the slip as aforesaid, deposited a quantity of soda in her boiler for the purpose of cleaning the same as aforesaid; and that when your libellant's steam tug refused to move as requested by the master of the 'Bulley,' the latter ranged alongside about six feet distant from the port side of the 'Nicoll' and proceeded to blow off her boiler toward the 'Nicoll,' thereby deluging her with hot water and steam from the former's boiler and destroyed all the paint on the port side of the hull and house of the 'Nicoll.' "

The claimant in answering alleged:

"VI. That if the libellant was damaged as stated in the libel, any action of the tug 'Bulley,' contributing to such damage was the wilful act of some person or persons on the said tug and not within the scope of their employment by the claimants."

The libellant excepted to this allegation on the ground of its being insufficient and irrelevant and it was agreed between the parties that the question of the liability of the Bulley, should be determined thereupon.

The libellant urges that the fact that the injury complained of was a maritime tort is sufficient of itself to render the Bulley responsible therefor.

The claimant urges that no liability attaches to the Bulley from an injury to another vessel inflicted maliciously by one of her employees.

While under the law of master and servant there might be much to sustain the claimant's position, as it is admitted that the act was a wilful one of some person on the tug, not within the scope of his employment, yet under the maritime law, it seems to be well settled that a vessel committing a tort is liable therefor, notwithstanding an unauthorized act on the part of some person on board.

A few citations from leading authorities will suffice to sustain this position.

In The United States v. The Brig Malek Adhel, 2 How. 210, 11 L. Ed. 239, a case was presented for forfeiture of the vessel by reason of an act of piracy. It was admitted that her owners never contemplated or authorized the aggressive acts of the vessel, which were committed under false pretenses and wantonly and wilfully without provocation or justification. In delivering the opinion of the court, Mr. Justice Story said (pages 232–234 of 2 How., pages 248, 249 of 11 L. Ed.):

"The next question is, whether the innocence of the owners can withdraw the ship from penalty of confiscation under the act of Congress. Here, again,

it may be remarked that the act makes no exception whatsoever, whether the aggression be with or without the co-operation of the owners. The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. The vessel or boat (says the act of Congress) from which such piratical aggression, &c., shall have been first attempted or made shall be condemned. Nor is there anything new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offence has been done as the offender, without any regard whatsoever, to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party. The doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws; and has been applied to other kindred cases, such as cases arising on embargo and non-intercourse acts. In short, the acts of the master and crew, in cases of this sort, bind the interest of the owner of the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs. In the case of The United States v. The Schooner Little Charles, 1 Brock. 347, 354 [Fed. Cas. No. 15,612], a case arising under the embargo laws, the same argument which has been addressed to us, was upon that occasion addressed to Mr. Chief Justice Marshall. The learned judge, in reply, said: 'This is not a proceeding against the owner; it is a proceeding against the vessel for an offence committed by the vessel; which is not the less an offence, and does not the less subject her to forfeiture because it was committed without the authority and against the will of the owner. It is true that inanimate matter can commit no offence. But this body is animated and put in action by the crew, who are guided by the master. The vessel acts and speaks by the master. She reports herself by the master. It is therefore not unreasonable that the vessel should be affected by this report.' The same doctrine was held by the court in the case of The Palmyra, 12 Wheat. 1, 14 [6 L. Ed. 531], where referring to seizures in revenue cases, it was said: 'The thing is here primarily considered as the offender, or rather the offence is primarily attached to the thing; and this whether the offence be malum prohibitum or malum in se. The same thing applies to proceedings in rem or seizures in the Admiralty.' The same doctrine has been fully recognized in the High Court of Admiralty in England, as is sufficiently apparent from the Vrow Judith, 1 Rob. Adm. 150; The Adonis, 5 Id. 256; The Mars, 6 Id. 87, and indeed in many other cases, where the owner of the ship has been held bound by the acts of the master, whether he was ignorant thereof or not.

The ship is also by the general maritime law held responsible for the torts and misconduct of the master and crew thereof, whether arising from negligence or a wilful disregard of duty; as for example, in cases of collision and other wrongs done upon the high seas or elsewhere within the admiralty and maritime jurisdiction, upon the general policy of that law, which looks to the instrument itself, used as the means of the mischief, as the best and surest pledge for the compensation and indemnity to the injured party."

The China, 7 Wall. 53, 19 L. Ed. 67, is a leading case upon the subject. There a question arose as to the exemption of a vessel for collision liability by reason of being in charge of a compulsory pilot. In holding the vessel liable, Mr. Justice Swayne said (page 68 of 7 Wall., page 73 of 19 L. Ed.):

"The maritime law as to the position and powers of the master, and the responsibility of the vessel, is not derived from the civil law of master and servant, nor from the common law. It had its source in the commercial usages and jurisprudence of the middle ages. Originally, the primary liability was upon the vessel, and that of the owner was not personal, but merely incidental to his ownership, from which he was discharged either by the loss

of the vessel or by abandoning it to the creditors. But while the law limited the creditor to his part of the owner's property, it gave him a lien or privilege against it in preference to other creditors.

The maxim of the civil law—sic utere tuo non lædas alienum—may, however, be fitly applied in such cases as the one before us. The remedy of the damaged vessel, if confined to the culpable pilot, would frequently be a mere delusion. He would often be unable to respond by payment—especially if the amount recovered were large. Thus, where the injury was the greatest, there would be the greatest danger of a failure of justice. According to the admiralty law, the collision impresses upon the wrong doing vessel a maritime lien."

In The John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969, in discussing the question of a lien, Mr. Justice Gray said (page 120 of 170 U. S., page 547 of 18 Sup. Ct. [42 L. Ed. 969]):

"The foundation of the rule that collision gives to the party injured a jus in re in the offending ship is the principle of the maritime law that the ship, by whomsoever owned or navigated, is considered as herself the wrong doer, liable for the tort, and subject to a maritime lien for the damages."

It follows that the exception should be sustained and a decree entered for the libellant, with an order of reference.