# THE FIFTH CONGREGATIONAL CHUHCH OF WASH-INGTON, D. C., v. BRIGHT.

## SAME v. SAME.

EQUITY; INTERVENERS; APPEALS; COSTS; PROMISSORY NOTES; PAYMENT; PRINCIPAL AND AGENT; CANCELATION OF INSTRUMENTS.

1. The substitution, by permission to intervene, of the grantee of real estate pending litigation over it, as the real party in interest, for the grantor, the nominal party, subject to all equities and defenses existing between such nominal party and the defendant, is not prejudicial to the defendant; and an appeal by the intervener will not be dismissed on the ground that it had no right to be heard except by a supplemental bill.

2. The matter of costs is not *per se* a proper subject of an appeal, but may be considered incidentally, as connected with the principal decree, when the correctness of the latter is directly before the court. (Following *Tuohy* v. *Hanlon*, 18 App. D. C. 225.)

3. When one of two innocent persons must suffer a loss occasioned by the wrongful act of a third person, the one must suffer it who, by his negligence or inadvertence, has placed it in the power of such third person to perpetrate the wrong, which otherwise would not have been perpetrated. (Following *Carusi* v. *Savary*, 6 App. D. C. 330.)

4. Where a promissory note is payable at the office of a broker, it is the duty of the maker or indorsee, in the absence of directions from the holder to the contrary, to tender payment there; and, finding the note in the broker's possession, the payee has the right to assume that the broker has authority to receive payment thereof.

5. Where the owner of real estate subject to a deed of trust securing a promissory note pays the note to one of the trustees, to whom it has been sent for collection and at whose office it is payable, procures the cancelation of the note represented by such trustee to be the one secured, and receives a properly executed release of the deed of trust, the

trustee receives such payment as the agent of the holder, and the latter will not be entitled to a cancelation of the release and foreclosure of the deed of trust, if the trustee absconds with the money so paid, after returning the genuine note to the holder, with an extension of time for payment indorsed thereon.

Nos. 1671 and 1674. Submitted October 12, 1906. Decided November 7, 1906.

HEARING on an appeal by one of several defendants, who had been granted the right to intervene from a decree of the Supreme Court of the District of Columbia setting aside a release of a deed of trust, etc.; on an appeal (specially granted) by the same defendant from an order requiring it, as an intervener, to pay one half of the costs at that time incurred; and on motions by the appellee to dismiss both appeals. *Motion to dismiss special appeal granted, other motion to dismiss overruled, and decree, and order for payment of costs reversed.*

The COURT in the opinion stated the facts as follows:

No. 1671 is an appeal from a decree of the supreme court of the District of Columbia setting aside a release of a deed of trust to appellant's predecessor in title, and foreclosing the trust, and ordering a sale of the property.

No. 1674 is a special appeal from the order of the supreme court of the District imposing upon appellant, as intervening petitioner below, at the time of granting its petition to intervene, the payment of one half of the costs at that time incurred.

The facts are these:

On or about January 6, 1898, Miss Louisa D. Lovett, the adopted daughter and amanuensis of Charlotte Bostwick, of Philadelphia, trustee under the will of Emma L. Breese, deceased, sent $8,000 on the account of Mrs. Bostwick, as trustee, to E. Welsh Ashford, "Financial Agent," real estate and loan broker, with offices at No. 1410 G street, N. W., Washington, D. C. That there had already been some correspondence between Mrs. Bostwick, as trustee as aforesaid, and Ashford, is apparent from the fact that the $8,000 was actually sent him in the communication of January 6. This money, according to

Ashford's letter of acknowledgment dated January 11, 1898, was to be invested by him for Mrs. Bostwick, as trustee. At about this time Loring Chappel, a builder of Washington, D. C., applied to William K. Ellis, a local real estate and loan broker, for a loan. Ellis, not having any clients who then desired to loan money, applied to Ashford, who agreed to make the loan. Thereupon, on January 7, 1898, Oella and Loring Chappel, her husband, executed a deed of trust, in which the said E. Welsh Ashford and the said William K. Ellis were named as trustees, to secure the payment of four promissory notes, among which was one in the sum of $2,000, and one in the sum of $400, secured on lot 64 in Oella Chappel's subdivision of lots in square 911, as per plat recorded in liber 21, folio 69, of the records of the office of the surveyor of the District of Columbia. Each of these two notes was payable to the order of Edward F. Riggs, a mere accommodation indorser, three years after date, with interest at 6 per cent semiannually, *interest and principal being payable at 1410 G. Street, N. W., Ashford's office.* On January 10, 1898, the day the loan to the Chappels was consummated, Riggs indorsed the note in controversy to Charlotte Bostwick, trustee under the will of Emma L. Breese, deceased, without recourse to him. On the following day, January 11, 1898, Ashford inclosed this note, with two others, the three aggregating the $8,000 previously sent him for investment, to Miss Lovett for Charlotte Bostwick, trustee. On July 13, 1898, the Chappels conveyed lot 64, subject to the encumbrance of $2,400 represented by the $2,000 note in suit and the $400 note to which reference has been made, to Bela N. Seymour, in whose name the equitable title to lot 64 stood when the notes for $2,000 and $400 respectively became due, on January 7, 1901. Charlotte Bostwick, the original trustee, died on May 6, 1899, and on January 23, 1900, Robert S. Bright, an attorney of Philadelphia, was appointed to succeed her as trustee. Bright had previously represented Mrs. Bostwick as attorney in fact in connection with her duties as trustee. It appears that he also represented other estates, either in the capacity of attorney or as trustee, and that prior to January, 1898, and during the period covered in this controversy, he had several conversations with

Ashford, either in Washington or in Philadelphia, and frequently corresponded with him in reference to this transaction and others. On January 2, 1900, in a letter to Ashford, Bright said: "I also received your check for $13.50, the int. on Colver note until December 7, 1900. I also note what you say about the Smith-Arnott note for $1750 which you still retain. I trust there will not be much more delay about this." On June 29, 1900, Bright wrote to Ashford, and in the letter said: "When the Driver note is paid off you can reinvest the principal in any good safe loan paying good interest." On October 9, 1900, Bright wrote Ashford, acknowledging receipt of a "check for $5,600.83 being principal of two notes of Charles R. Pickford for $2,700 each, with interest to September 14th, 1900." On December 22, 1900, Bright again wrote Ashford about the Colver and Smith-Arnott notes, saying: "What about the Colver and Smith-Arnott notes *which you have had now for some months for adjustment?*" On January 2, 1901, five days prior to the maturity of the note in suit, Ashford wrote Bright, and inclosed "certified check for $1,840.40 to pay note of Alice A. Smith and Cath. A. Arnott, $1750, with interest at 6 per cent from February 23, 1900, to January 2, 1901." Ashford in this letter further says: *"I believe there is in your custody a note of Oella and Loring Chappel, $2,000, secured by deed of trust on lot 64, square 911, maturing January 7. Will you kindly register this note and accompanying papers as it will be paid at maturity."* On the following day, January 3, 1901, four days before the maturity of the note in controversy, Bright wrote Ashford as follows: "Dear sir: Your letter with check to pay Smith-Arnott note and interest to date ($1,840.40) was received. * * * I also inclose herewith the Oella and Loring Chappel note for $2,000, which, I am sorry, is to be paid off as you write. Interest is paid on this note to July 7, 1900, making six months interest due July* 7th, 1901 (1901). I have no title papers with this note. Most of the notes which I hold have title papers, but some have not and this is one of those which has not. I hope the $2,400 and $2,100 notes will not

---

*Evidently intended for January.

be paid off.  I shall be glad to extend the enclosed Chappel note at 5 per cent, as it is held in an estate in which the rate of interest does not make so much difference, provided the security is good."  On January 4, 1901, Ashford acknowledged the receipt of the $2,000 Chappel note as follows: "I have your favor of January 3d, wth $2,000 note of Oella and Loring Chappel, secured on sublot 64, square 911, this city, *for payment and remittance."*

On January 14, 1901, Bright wrote Ashford about certain other loans, and in the letter said: "Is the $2,000 Chappel note sent you on January 3rd to be paid off or extended?  I hope it can be extended, as stated in my letter of January 3 to you.  You now have received three Chappel notes from me, one for $2,000, one for $2,100, and one for $2,400."  On January 5, 1901, Bela N. Seymour, the grantee as aforesaid of the Chappels, handed Ashford a certified check for $2,060, which represented the principal and interest to January 7, 1901, of the Chappel loan.  Ashford, as we have seen, then had this note in his possession, with full authority from Bright, the trustee, either to receive payment thereon or to extend it.  On January 7, 1901, the day the note became due, the check was paid, and the record shows that Seymour had already paid the $400 note.  Seymour being dead and Ashford having absconded, our knowledge of the facts surrounding these payments must be gained from other sources and circumstances.  It appears, however, that Ashford, fully authorized to accept payment on the note, appeared with a notary at the office of his cotrustee under the deed of trust, Mr. Ellis, for the purpose of executing a release, and exhibited to Mr. Ellis two notes, one for $2,000 and one for $400; that Mr. Ellis, whom the record shows to be an exceptionally particular man, and to have been familiar with the signature of the Chappels, carefully examined both notes, and observed that each was marked "Paid and Canceled."  Mr. Ellis thereupon joined Ashford in the release set aside by the court below.

No question is made, aside from the fraud alleged to have been practised by Ashford, as to the legal sufficiency of this release.  The $400 note, marked as above stated, was found

among Mr. Seymour's papers after his death. What became of the $2,000 note is not known.

On January 15, 1901, Ashford transmitted to Bright the note in controversy, with an indorsement thereon extending the time of payment to January 7, 1903, with interest at 5 per cent semiannually.

On November 4, 1902, Bela N. Seymour conveyed said lot 64 to Edward Parsons Seymour, who in turn, on October 1, 1903, conveyed the property to the Fifth Congregational Church of Washington, D. C., the appellant herein, both deeds being of record.

The appellee, Robert S. Bright, the petitioner below, filed his original bill on February 18, 1903, against Oella Chappel, Loring Chappel, E. Welsh Ashford, William K. Ellis, Edward F. Riggs, Bela N. Seymour, and Edward Parsons Seymour, to foreclose the trust and for a sufficient decree against the Chappels. On April 18, 1905, leave was granted to amend the original bill by adding a prayer to cancel the release, and the amended bill was filed April 27, 1905. On April 19, a stipulation was entered into between counsel for the complainant and counsel for Edward Parsons Seymour and counsel for the Chappels and for Mr. Ellis, that the testimony already taken might stand as the testimony under the amended bill.

On May 31, 1905, the court having announced its opinion in favor of appellee, the appellant, the Fifth Congregational Church of Washington, D. C., filed a petition for leave to intervene, alleging, among other things, the conveyance to it of October 1, 1903; that shortly after receiving this deed of conveyance it had applied, through its counsel, to the solicitor for the complainant requesting him to consent to the passage of an order making the church a defendant in the cause "subject to all equities and defenses which might exist against its grantor, the said Edward Parsons Seymour, but said request was denied;" that the church was advised and believed it to be doubtful whether an appeal would be prosecuted by the defendant of record, the said Edward Parsons Seymour, from the decree which was about to be entered against him. On July 13, 1905, before a final decree was entered, the petition of the church for

leave to intervene was granted, and it was ordered that the church pay one half the costs then incurred. A special appeal was perfected and allowed from so much of the order of the court as related to the payment of costs by the church. The decree, on the merits, referred the cause to the auditor to ascertain the amount due on said note under the deed of trust, and the order confirming the auditor's report was filed February 21, 1906.

On August 4, 1905, the intervener asked leave to sever from its codefendants on the ground that they had declined to appeal, and on the same day the order granting the request was made.

*Mr. J. J. Darlington* and *Mr. W. C. Sullivan* for the appellant.

*Mr. S. Herbert Giesy,* for the appellee:

1. Ashford was not the agent of the appellee, Robert S. Bright, trustee. Mr. Bright testifies that he was not, and is corroborated by Louisa D. Lovett. Ashford always wrote of himself as the vendor of notes, and received through Ellis part of the commission paid by the Chappels for the loan.

The letter of December 12, 1902, shows that the appellee, Bright, dealt with Ashford in the belief he represented the borrowers for whom he secured loans.

The case relied upon to sustain appellant's contention that the sending of the note to Ashford by Bright constituted the former, the complainant's agent declares that if the money is taken to the bank mentioned as the place of payment, and there deposited by the obligor, the bank is the agent of the obligor and not of the obligee. *Ward* v. *Smith,* 7 Wall. 451.

Ashford was certainly the agent of Seymour in securing the release. If Seymour had been a careful business man, and had taken up the note, as he should have done, he could have secured the release himself, but he secured the services of Ashford to get the release. The testimony and exhibits show that Ashford held himself out to Bright as a vendor of secured notes, and

the complainant treated him as such, and, in the face of the complainant's positive denial, Ashford cannot be constituted his agent by inference. Mechem, Agency, p. 80; *McGoldrich* v. *Willits,* 52 N. Y. 612; *White* v. *Davidson,* 8 Md. 169; *Fisher* v. *Shiller Lodge,* 50 Iowa, 462; *Bank* v. *Free,* 67 Iowa, 12.

But the complainant, Bright, is a trustee appointed by the Pennsylvania court, and as such cannot appoint an agent without the consent of the Pennsylvania court. *Delegatus non potest delegari.* *Berger* v. *Duff,* 4 Johns. Ch. 369; *The California,* 1 Sawy. 603. Mechem, Agency, p. 189.

When Seymour secured the services of Ashford to get the release, he constituted Ashford, Seymour's agent. He, then, cannot be the agent of the other side. *Ins. Co.* v. *Eldridge,* 102 U. S. 547; Mechem, Agency, p. 67; *Copeland* v. *Mercantile Ins. Co.* 6 Pick. 204; *Raisin* v. *Clark,* 41 Md. 158; *Conn. General L. Ins. Co.* v. *Eldridge,* 102 U. S. 547. Seymour failed to take up the note, as was the duty of a careful business man, and therefore should be the one to suffer the loss. *McGolrich* v. *Willits,* 52 N. Y. 612.

The appellee, Bright, was guilty of no conduct which enabled Ashford to commit the fraud. He had a right to presume that if the note was to be paid it would have to be surrendered, and the payor would demand its delivery. Seymour, on the other hand, did not demand the note, but demanded the release, and he gave Ashford the money on the 5th of January, 1901, with which to pay a note due on the 7th of January, 1901, instead of paying the note himself. Smith, Manual of Equity, 69; *Carusi* v. *Savary,* 6 App. D. C. 344; *Adsetts* v. *Hives,* 33 Beav. 57.

2. If appellee is entitled to foreclosure, a fraudulent release is no bar to a decree for foreclosure. *Lilly* v. *Quick,* 1 Green, C. R. 97; *Banta* v. *Vreeland,* 2 McCarter, 103; *Harrison* v. *N. J. R. R. & T. Co.* 4 E. E. Green, 488; *Ely* v. *Ely,* 20 N. J. Eq. 43; *Higman* v. *Stewart,* 38 Mich. 513; *Burnett* v. *Lyford,* 93 Cal. 114.

Mr. Justice ROBB delivered the opinion of the Court:

The appellee now moves to dismiss the appeal of the church

on the ground that it had no right to be heard unless through a supplemental bill. We think appellant was properly permitted to intervene, as the rights of the appellee were in no way prejudiced thereby; neither was there any unnecessary delay on the part of the church in filing its motion to intervene, since there was no necessity for intervention so long as its predecessor in title was willing to conduct the defense. The appellee had known for some time that the church was the real party in interest. The mere substitution of the real for the nominal party in interest, "subject to all equities and defenses which might exist against its grantor, the said Edward Parsons Seymour," in no way prejudiced the appellee.

The motion to dismiss, therefore, will be denied.

We will next consider the motion to dismiss the special appeal.

It appears: First, that the interest of the intervener was acquired October 1, 1903.

Second, the suit was defended by counsel for Chappel and Seymour, who were also assisted by counsel for intervener.

Third, after the purchase by the church, consent to intervene for the protection of its interests was requested of counsel for complainant, and denied.

Fourth, the court announced its opinion on May 18, 1905, in favor of appellee.

Fifth, on May 31, 1905, the petition for intervention was filed, and same granted July 13, 1905, before entry of final decree on that day.

Sixth, on the same day the intervener noted an appeal from the decree in open court, and bond was fixed.

Seventh, on August 4, 1905, the intervener asked leave to sever from its codefendants, who had declined to appeal, and on the same day the order was made.

The special appeal from the order requiring the intervener to pay costs was presented to this court and allowed May 4, 1906. This appeal now seems to have been unnecessary. It was granted, however, without much inquiry as to its necessity, because the main case was already in the court, and no possible injury could result from granting the special appeal. It fur-

ther appears that the payment of costs was not made a condition to the leave to intervene, although such an order was sought.

The intervener was before the court, and the order was made regarding the payment of costs, and is to be regarded as a part of the final decree entered on the same day. A mere decree for the payment of costs, especially in an equity cause, being a matter of discretion with the trial court, no appeal will lie therefrom, but, if an appeal be taken from a whole decree, the question of costs, as a part of that decree, will be taken notice of as incidentally connected therewith, when that is the question directly before the court. *United States* v. *The Malek Adhel,* 2 How. 210, 233, 11 L. ed. 239, 249; *Canter* v. *American Ins. Co.* 3 Pet. 307, 7 L. ed. 688; *Du Bois* v. *Kirk,* 158 U. S. 58, 67, 39 L. ed. 895, 15 Sup. Ct. Rep. 726; *Tuohy* v. *Hanlon,* 18 App. D. C. 225, 230. In 2 How. 237, 11 L. ed. 251, the court said: "The matter of costs is not *per se* the proper subject of an appeal, and it can be taken notice of only incidentally, as connected with the principal decree, when the correctness of the latter is directly before the court."

The special appeal will therefore be dismissed, with costs.

The first assignment of error which it is necessary to notice relates to the ruling that the note in suit is genuine. While the evidence, as we view it, is not at all convincing on this point, we will assume for the purposes of this opinion that this note is the identical note signed by Oella and Loring Chappel on January 7, 1898.

The third and fourth assignments of error may be considered together, as the third challenges the ruling that Ashford was the agent of Seymour, while the fourth specifies as error the failure of the court to rule that Ashford was the agent of Bright, the appellee.

We think the facts stated clearly indicate for whom Ashford was acting when he received payment on the note. Prior to its maturity Bright sent the note to Ashford, *at whose office it was payable,* with full authority to receive payment thereon, and, of course, to execute a release of the trust. Seymour, the equitable owner of the property covered by the trust, paid Ashford, in whose custody the note then was, $2,060, principal

and interest due on the note at maturity.  We think, clearly that Ashford was acting for Bright, and, therefore, his agent.  No negligence can be attributed to Seymour, as he was careful to have a sufficient release of the trust executed and recorded.  He also procured the cancelation of a $2,000 note, which Ashford undoubtedly represented to be the original and genuine note, and which must have looked like the original, because Mr. Ellis, Ashford, cotrustee, who was familiar with the signatures of the Chappels, after careful examination, believed it genuine and joined Ashford in the release.

It was suggested at bar that Seymour should have made his check payable to Bright, instead of Ashford.  This objection is without merit, for the reason that Seymour would have been within his rights had he made a cash payment to Ashford.  Indeed, Ashford might have declined to accept any but a cash payment.

Objection is also made that Seymour did not demand surrender of the note at the time of payment.  The only evidence upon which to base this objection is the testimony that the $400 canceled note was found among Seymour's papers after his death, but that the $2,000 canceled note was not.  It is immaterial whether Seymour retained this note or destroyed it.  The evidence certainly does not warrant the conclusion that it was left in Ashford's possession.  Neither is there any contention that the note in suit is the note marked "Paid and Canceled," which was exhibited to Mr. Ellis by Ashford.  Moreover, Mr. Bright, in selecting Ashford as his agent for the collection of this note, made the fraud possible, for it is apparent that Ashford used two notes, one of which must have been a forgery. To obtain the money from Seymour and to procure the signature of his cotrustee to the release, he marked one "Paid and Canceled," and the other he sent his principal, Mr. Bright, marked "Extended."  Throughout the transaction, as above stated, he represented Mr. Bright as Mr. Bright's agent, and, as this court said in *Carusi* v. *Savary,* 6 App. D. C. [at page] 344: "The question in this case, as we understand it, is which of two innocent persons should be required to suffer the loss occasioned by the wrongful act of a third person; the one who, by his negli-

gence or inadvertence, has placed in it the power of such third person to perpetrate the wrong which otherwise would not have been perpetrated, or the one who, without any negligence on his own part, has been misled by the wrongdoer into a situation into which otherwise he would not have entered. And in the light of modern equity, of the overwhelming mass of modern judicial decision, and of what seems to us to be the dicate of natural jusice, that question, in our opinion, can admit of but one answer."

Had Bright sent the note to a bank or trust company for collection or extension, notice would have been given Seymour prior to the maturity of the note, and Ashford would not have been in a position to perpetrate the fraud, for, had Seymour made payment to a bank or trust company, the money would have been promptly remitted, and Bright's note would have been marked "Paid and Canceled," instead of "Extended."

As the note was payable at Ashford's office, it was the duty of Seymour, in the absence of directions from Bright to the contrary, to tender payment there, and, finding the note in Ashford's possession, he had a right to assume that Ashford had authority to receive payment thereon.

In the case of *Williams* v. *Walker,* 2 Sandf. Ch. 325, the court said: "The authority is wholly unlike a general power or a general direction to pay to the agent. It rests entirely upon the fact of the possession of the bond. While that possession continued, the payments were justified, even if Mrs. Walker were ignorant of its continuance. Her safety required her on each occasion to look to the bond, the sole evidence then of this special authority; and to see that her payments were properly indorsed. If she chose to pay without this caution, it did not impair the validity of the payments, while the special authority in fact continued." *Megary* v. *Funlis,* 5 Sandf. 376; *Caldwell* v. *Evans,* 5 Bush, 380, 96 Am. Dec. 358.

In the case of *Doubleday* v. *Kress,* 60 Barb. 181, the plaintiff held a note of defendant for $800, and intrusted same to one Murray to present to defendant for payment, which note was not indorsed by plaintiff. Murray presented the note to defendant, and received payment in full of principal and interest, and then pretended to plaintiff that he had only received the

interest, and afterwards absconded with the $800. The court sustained the payment made to Murray, and said: "It is well settled that a debtor is authorized to pay to an agent any sum which is due upon a security which has been intrusted to the agent, by the holder, for the purpose of collecting any part of it. As, where the agent has been authorized to receive the interest only, but receives the principal. In fact the authorities go to the extent of holding a payment valid, made to an agent who is merely intrusted with the possession of the security, without the express authority to receive or collect any part of it. The ostensible authority attributed to a party to whom is intrusted an instrument to secure the payment of money is to receive payment according to its terms. And large amounts are constantly paid to parties in possession of such securities, without any other evidence of authority than the bare possession of the security." See also *Stiger* v. *Bent,* 111 Ill. 328.

In the case of *Glatt* v. *Fortman,* 120 Ind. 384, 22 N. E. 300, the court held that a bank was the payor's agent when the payor made payment to the bank, the place designated for payment in the note, but based its decision on the fact that the security was not in possession of the bank at the time payment was made; and said that "the rule upon which the payor is bound to act is that the bank is not authorized to receive payment *unless the note is lodged with it,* for the designation of the place of payment does not bind the payee to present the note at that place," —clearly indicating that, if the note had been lodged with the bank at the time of payment, the decision of the court would have been that the bank was the payee's agent.

In the case of *Ward* v. *Smith,* 7 Wall. 447, 19 L. ed. 207, Ward executed three bonds which were designated payable at a certain bank. Smith deposited *one* bond with that bank for collection, and retained the other *two.* Ward made various payments to the bank on the *three* bonds, and the court held that the bank acted as the agent of the payee in receiving payment on the one bond which had been lodged with it for collection, and as the agent of the payor or obligor in receiving payments on the other two bonds. Justice Field, in delivering the opinion of the court, used the following language: *"When the in-*

*strument is lodged with the bank for collection, the bank be-
comes the agent of the payee or obligee to receive payment.*
\* \* \* In the case at bar only one bond was deposited with
the Farmers' Bank. That institution, therefore, was only agent
of the payee for its collection. It had no authority to receive
payment of the other [two] bonds for him or on his account."

*Connecticut General L. Ins. Co.* v. *Eldredge,* 102 U. S. 545,
26 L. ed. 245 (appeal from the supreme court of the District
of Columbia), cited by appellee, in which the court refused to
set aside a deed of release, upon examination will be found not
to bear out appellee's contention that the deed of release in suit
should be set aside. The facts in that case are very different
from those in the case at bar, but in both cases the wrongdoer
was the agent of the party seeking to set aside the release. The
insurance company through its Washington agent, one Bigelow,
placed a loan of $32,000, secured by deed of trust on certain
property in the District, and left with Bigelow the investigation
of the title of the security. Bigelow, knowing that his company
would take only a first deed of trust on the property, and being
aware there was a prior deed of trust on the property, and that
the prior trustee had executed a release without the notes se-
cured by the trust being paid, nevertheless placed the loan for
his company. Suit was brought by the company to set aside this
deed of release as a fraud on its rights. The court refused to
set aside the release, and said: "Where a purchaser (and a
mortgagee or trustee of a trust deed stands in the same posi-
tion), at the time of taking a deed, has information that a prior
mortgagee or trustee of a prior deed has released the property
from the mortgage or trust, without payment of the notes or
their surrender, or express authority from the holder of them,
he will take the property subject to any equitable right of the
holder of the notes to secure the payment of which the mortgage
or trust deed was executed. \* \* \* The company, as al-
ready stated, must be deemed to have known of the want of pow-
er in the trustee to release the property from the Coburn deed.
In the case just cited there was no contention that the notes
were paid, but in the case at bar payment was made on the
notes, making a stronger reason for the court's refusal in the

case at bar than in the cited case. Moreover, the knowledge on the part of the agent of the fraudulent release, and his act in procuring same, were held to be knowledge and action of his principal, and hence binding upon the company.

The present case differs from the cases cited, in that it is not contended that Ashford was not fully authorized to receive payment of the note from Seymour; the contention being that in accepting payment he was Seymour's agent, and not Bright's, and that therefore Seymour was responsible for the failure to remit to Bright the amount collected. We think this contention is not only disproved by the record, but that it fully and conclusively appears that Ashford was the agent of Bright when he received payment from Seymour, and that, no negligence being attributable to Seymour, his payment to Ashford absolved him from further liability under the note.

It follows that the release of the trust executed by Ashford and Ellis must be sustained.

It is our opinion that the decree of the court below should be reversed, including the order requiring the payment of costs, and that the cause be remanded, with directions to enter a decree in conformity with this opinion, and it is so ordered.

*Reversed.*