James **FARNUM,** Pasquale Chirichella, Alfonso Lagomarsino, Tony Appulise, Edward Willis and Robert G. Soriano, Libelants,

v.

S/S **OSLOFJORD,** her tackle, apparel, furniture and engines, etc., and Den Norske Amerikalinje A/S and Norwegian America Line Agency, Inc., Respondents.

United States District Court
S. D. New York.
March 5, 1963.

Standard, Weisberg & Harolds, New York City, for libelants; Malcolm B. Rosow, New York City, of counsel.

Mendes & Mount, New York City, for respondents; Frank A. Bull, Daniel Huttenbrauck, New York City, of counsel.

BONSAL, District Judge.

The libelants, six employees of the Bethlehem Steel Company's Shipyard in Hoboken, New Jersey, seek recovery against the respondents (S/S Oslofjord, Den Norske Amerikalinje A/S and Norwegian America Line Agency, Inc.) for injuries which they sustained when the OSLOFJORD fell over while in Floating Dry Dock # 3 in the Bethlehem Shipyard at Hoboken in the early morning hours of January 10, 1957. Pursuant to stipulation, the issue of liability was tried separately, leaving the issue of damages for a later trial, if necessary.

The Court finds that the libelants have failed to prove by a fair preponderance of the evidence that any negligence on the part of the respondents or unseaworthiness on the part of the vessel was a proximate cause of the fall of the OSLOFJORD. Therefore, the libel must be dismissed.

The OSLOFJORD is a 16,844 ton merchant ship. On January 9, 1957 she arrived in New York from Norway and

discharged her passengers at Pier 42, North River. During her crossing from Norway the OSLOFJORD had encountered heavy seas and, as a result, had sustained a leaking stern gland. The respondents contracted with the Bethlehem Shipyard, Hoboken, to have the ship drydocked and the stern gland repaired.

The OSLOFJORD, with the assistance of tugs and with approximately 360 of her crew members aboard, entered the Bethlehem Shipyard at Hoboken on January 9, at about 12 noon. She had aboard approximately 1,570 tons of permanent ballast distributed through the deep holds, and cargo of 118 tons. The vessel was drydocked on Floating Dry Dock # 3 as described below, with her bow in to the shore and her port side facing south. The drydocking operation was performed by Bethlehem employees with Bethlehem equipment. By 2:30 P.M. the OSLOFJORD was high and dry and work was commenced on the stern gland. As the repairs were to last less than a day, the officers and crew remained aboard.

Floating Dry Dock # 3 is 600 feet long, extending eastward into the Hudson River. Six sections, each 100 feet in length and numbered consecutively 1 to 6 from the shore out, comprise the dock. Only five sections, 1–5, were required in connection with the docking of the OSLO-FJORD. Each section of the dock is supported by a large pontoon, divided by a bulkhead into a north and south half, so that water could be run into or removed from the pontoon on only one side. Each half of a pontoon is controlled by six valves or "gates" which are opened and closed by twelve dockhands stationed on the "wing walls" of the dock; one on each side of each section. Each dockhand operates three "green gates" or valves to flood one-half of the pontoon, and three "red gates" to pump water out of the one-half of the pontoon. When a ship is to be dry-docked, the dock master (the yard representative in charge of the docking operation) obtains plans of the configuration of the ship's bottom and

has bilge blocks prepared to fit. These blocks are placed in approximately the correct position and the dock is then submerged by opening the green gates on each section.

After the dock is submerged, the ship is brought into position above it. The red gates are opened and water is slowly pumped out of the pontoons until the ship's keel is gently resting on the dock. The bilge blocks are then slammed into position and the ship raised until it is high and dry.

To lower and refloat a ship the process is reversed. The twelve sets of gates are manned and the green flood valves are opened. The ship and dock are then usually brought to a position described as "decks to", in which the dock is lowered so that the water is just awash on the floor of the dock. Each of the twelve men independently determines when his section has been brought to "decks to" and then shuts his green gates.

The "decks to" position is utilized as a safety measure by the dock master to insure that the ship and dock are level before proceeding further. Once "decks to" has been obtained, the men are ordered to once again open their green gates and the dock is lowered until the ship is afloat.

The undocking operation of the OS-LOFJORD commenced shortly after 4 A.M. on January 10th. When it began, the libelants, except Willis, were manning Dry Dock # 3 for the refloating of the OSLOFJORD and were taking their orders from Peter Comar, the dock master. Libelant Willis was below decks within the ship still working on the packing of the stern gland. As the ship and dock were being lowered, the ship suddenly fell over on her port side, injuring the libelants who were stationed on the south wing wall of Dry Dock # 3 and the libelant Willis who was below decks.

The libelants bring their suit in Admiralty both in rem and in personam. They claim that the fall of the OSLO-

FJORD was due to the negligence of the respondents or the unseaworthiness of the vessel, or both.

The Court is of the view that the proximate cause of the OSLOFJORD's fall was the factors described by Comar, the dock master employed by the Bethlehem Yard, who was in charge of both the docking and undocking of the OSLO-FJORD. Mr. Comar described the accident in detail and readily admitted that it was due to his own negligence and to the failure of Bethlehem's equipment.

On the morning of January 9th Mr. Comar was ordered to dry-dock the OS-LOFJORD later that day. He testified that because of the draft of the vessel (some twenty-four feet) and the silt problem present in the Hudson River, it was necessary to bring the OSLOFJORD aboard the dry dock at flood tide. This gave Mr. Comar less time than usual to prepare Dry Dock # 3 for the OSLO-FJORD as there was a tanker on the dock which had first to be removed. Because of the short time available, Mr. Comar had only half the usual number of bilge blocks rebuilt to the OSLOFJORD's requirements. Moreover, he did not have time to build a crib for the bow prior to the docking operation, as is ordinarily done. The crib is used to cradle the bow and to place its weight on the forward sections of the dock, thereby distributing more evenly the weight of the vessel. The crib was inserted under the bow of the OSLOFJORD only after the full weight of the vessel had been brought to bear on the bilge blocks.

Therefore, the OSLOFJORD was initially raised without the benefit of a full complement of bilge blocks and of a crib. When she was most of the way out of the water, the dock master sent men down in boots to place more bilge blocks and to fit a crib. However, Mr. Comar testified that this did not totally correct the defect in not originally having the correct number of bilge blocks and the crib. For as the pontoons are pumped out, and the ship begins to rise, its full weight is brought to bear upon the blocks, causing them to be crushed down about two-and-a-half inches. When the additional blocks and crib were inserted after this initial compression, they did not support their full share of the ship's weight.

Consequently, from the very beginning the OSLOFJORD was not receiving full support as she lay in the dock. However, this fault would probably not have been apparent to the officers and crew of the vessel, even by inspection, as outward appearances showed the requisite number of bilge blocks and the crib.

Mr. Comar testified that the close relationship between the displacement of the OSLOFJORD and the lifting capacity of Dry Dock # 3 left little leeway for error in the support or in the handling of the vessel during the docking operation. This was particularly true in the case of Section 4 of the dry dock which because of its central location was supporting the heaviest part of the ship.

Before the refloating, at about 4 A.M. on the morning of the 10th, the dock master walked the perimeter of the dry dock and observed its freeboard (the distance between the floor of the dock and the surface of the water). Under ideal conditions there would be a uniform freeboard of twelve inches on all sides. In this instance, the freeboard was twelve inches on the south side, and four on the north side, giving an eight inch list to the north. Mr. Comar explained that once a ship was blocked and raised high and dry, she and the dry dock became an integral unit. The stability of the ship and dry dock became one; therefore any list would be the list of both. Consequently, the OSLOFJORD also had an eight inch starboard list with respect to the shore; it was not a list, however, with respect to the dock.

As the undocking operation commenced, Mr. Comar said he decided not to stop at "decks to" as was the usual practice. (Some of the libelants dispute this, testifying that the dock and vessel were brought to the "decks to" position.) Mr.

Comar tried to correct the eight inch list to the north by having the green (flood) gates opened first on the south side of the dry dock (the side with the higher freeboard). However, at least one of the green gates on the south side of Section 4 stuck in the open position, and before the north half of the pontoon of # 4 could be flooded, the partially submerged south half started to bring the empty north half out of the water. The north half of the pontoon rose out of the water as the south side continued to flood, making the north half's flooding system inoperative. As the south half went down, the north half rose and pushed against the starboard side of the vessel with the full force of its buoyancy. The result was to force the OSLOFJORD and the dry dock, as a unit, to fall over to port.

The OSLOFJORD came to rest, with a 25° list to port, on the south side of Dry Dock # 3 and the adjoining wall of the next dry dock. Pictures of the area taken after the accident show the north side of the faulty Section 4 rising out of the water on the starboard of the OSLOFJORD, while the southern half of Section 4 is completely submerged.

The OSLOFJORD was raised to a near upright position by having a New York City fireboat pump water into the north end of the pontoon of Section 4 until it came down far enough into the water so that its own pumps could operate. The whole dry dock was then lowered and the OSLOFJORD floated off. Following floating, the ship had a 17° list to port, because at the time she fell the cargo ports on her port side were open, allowing the cabins on that side to flood with eight feet of water. The shipyard pumped most of this water over the side by means of portable pumps placed in the cabins. The OSLOFJORD was straight in the water by 4 P.M. on the 10th.

It is the Court's opinion that, for the reasons mentioned above, the failure of the dry dock was the proximate cause of the OSLOFJORD's fall.

The libelants point to several factors from which they ask the Court to infer that the respondents or the ship were at fault. However, the libelants have not proved any of these factors, and if any of them existed as the Court is asked to infer, they were not a proximate cause of the accident.

In the first place, libelants claim that the OSLOFJORD was clandestinely taking aboard fresh water while in the dry dock, thereby changing the balance of the ship. It appears that the ship requested from the shipyard, and was receiving, water for circulation through the auxiliary motors. Normally, this water would cool the engines and then be passed overboard. Several of the libelants testified that the ship was receiving fresh water, and the inference the Court is asked to make is that the ship was deliberately diverting the circulating water from the auxiliary motors and stealing and storing it for later ship's use. In support of this hypothesis, libelants point out that the ship's mean draft was one-half inch greater after the drydocking operation than before. Since the ship was consuming fuel oil and fresh water for a boiler, which remained lit, it would be logical to assume that the draft of the ship would be less upon leaving the dry dock rather than greater. However, the OSLOFJORD, after her accident, had eight feet of water in her port cabins, sufficient to cause a 17° list. While this was subsequently pumped out, there may well have been considerable silt and some water which would have escaped the pumps, also much of the ship's furnishings would have been water-logged and would consequently add to the vessel's weight. In addition, the dock master testified that there was no fresh water connection on the dock, and that salt water was usually employed (and to the best of his knowledge was used by the OSLOFJORD) to cool the auxiliary motors of seagoing ships. The libelants have failed to prove that the vessel was taking and storing fresh water, or that any resulting im-

balance of the ship contributed in any way to the accident.

Libelants assert that the ship's master and officers were inattentive to their duties while she was in dry dock and, hence, negligent. They brought out that there were two inclinometers, one on the bridge, and one in the engine room, which, if observed, would have shown the list of the vessel; that there was no lookout or officer assigned to the forward end of the ship who could have noticed the tilt and perhaps taken corrective measures; that the master and chief engineer were in their cabins at the time of the refloating; and that some male and female members of the crew were seen in the saloon during the night and a bottle of liquor was on the table. Suffice it to say, that no negligence of the officers and crew, even if the fragmentary evidence indicated such, had anything to do with the accident.

Two of the libelants testified that they observed a list of the OSLOFJORD when they came to work at approximately 2 A.M. on January 10, 1957. At that time, for the reasons previously described, the ship and dock acted as a single unit. Hence, a list could result either from a change in the balance of the ship or a change in the balance of the dock. The dock master found a list just prior to the undocking operation when he examined the freeboard. In the absence of proof not here furnished, the Court is unable to find that the list was due to the imbalance of the ship rather than the imbalance of the dock, or that any imbalance of the ship proximately caused the accident.

Some minor changes in balance are bound to occur when a fully manned vessel with a boiler operating is placed on a dry dock for fourteen hours, due to the consumption of water, fuel and other stores. Indeed, there was testimony that a list was not unusual. If the OSLOFJORD was clandestinely taking on water from a single two-and-a-half-inch hose, it can be as readily assumed that this would offset the water being consumed and hence help maintain the balance, as it is to assume that it would have changed it. However, even if the Court were to accept the unproven assumptions pressed upon it by the libelants that the balance was changed, causing the list of the vessel, the libelants may not recover for unseaworthiness. The list did not jeopardize the undocking operation. It could be corrected by opening the flood gates on the south side until the vessel was level, and then opening the remaining flood gates until the vessel was afloat. This was the operation which the dock master entered upon. The vessel and dock as a unit were straightened, but due to the failure of the dock, probably a defective gate or gates on the south side of Section 4, the vessel and dock began to list the other way (to port) and shortly afterwards fell over as previously described. It was the failure of the dock that produced the accident.

It is true that the respondents had an absolute duty to furnish "a vessel and appurtenances reasonably fit for their intended use". Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). But this duty does not require the furnishing of an accident free ship. Mitchell, supra. If the owner fails in this absolute duty, the ship is unseaworthy and liable *in rem* (and the owners *in personam*) for injury to those to whom the warranty of seaworthiness extends.

"[T]he concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question." (Marshall, J. in Mosley v. Cia. Mar. Adra, S.A., 314 F.2d 223 (2d Cir. Feb. 28, 1963).) It is true that in recent years the doctrine has been extended to gear supplied by others for an operation aboard ship, Petterson v. Alaska S.S. Co., 205 F.2d 478 (9th Cir. 1953), aff'd. per curiam, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) (see Burton, J. dissenting); and

has been held to apply to the misuse of gear otherwise seaworthy, which misuse rendered the gear unseaworthy. Di Salvo ·v. Cunard Steamship Co., 171 F. Supp. 813 (S.D.N.Y.1959). However, these extensions do not change the rule that unseaworthiness rests on the failure of the owners in their duty to furnish a seaworthy vessel.

Libelants have failed to establish that the OSLOFJORD and its appurtenances were unseaworthy in any respect at the time of the accident. Moreover, the Court finds that the condition of the vessel and its appurtenances had nothing to do with the accident. The vessel was the innocent instrument of the accident, which was due to the failure of the dry dock, resulting in excess buoyancy on the north side of the OSLOFJORD and lack of support on its south side.

The accident was the result of a sudden series of events which the respondents could not have foreseen or guarded against, which would have happened no matter how perfect the condition of the vessel and its gear, which were activated by people and equipment beyond the respondents' control, and, once in motion, were beyond the respondents' power to stop.

Since the Court holds that the injuries to libelants were not proximately caused by the unseaworthiness of the OSLO-FJORD, it is unnecessary to determine whether the warranty of seaworthiness extended to them as dry dock employees of the Shipyard. See Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

Finally, libelants contend that they are entitled to recover on the ground "that in an admiralty tort involving a vessel, the ship itself may be considered the offending personality" and that the ship "is liable *in rem* for its torts no mat-

ter who was then in possession of the ship or its appurtenances". (Libelants' Trial Memorandum, p. 8.) In support of its contention, libelants cite United States v. The Brig Malek Adhel, 2 How. 210, 43 U.S. 210, 11 L.Ed. 239 (1844); Canadian Aviator, Ltd. v. U. S., 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945). However, in Brig Malek Adhel, the vessel was being actively used for an unlawful purpose by the pirate master and crew which had taken it from the owners. Here, the OSLOFJORD was passive at the time of the accident. The liability of a vessel *in rem* was recognized in the Canadian Aviator, but the Court's holding was predicated upon the negligence of the ship's personnel in the operation of the offending vessel.

Libelants also seek to rely on the ancient notion of "deodand"; that anything that kills is forfeited to the king, and that by analogy the ship, as the offender, must be responsible *in rem* for its own acts. Cf. Burns Brothers v. Central Railroad of New Jersey, 202 F.2d 910 (2d Cir. 1953). The Court holds that the OSLO-FJORD was not the offender, but the innocent instrument of the harm, which was caused by the failure of the dry dock, and that as such the vessel is not liable *in rem*. Compare The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600 (1909), in which Mr. Justice Holmes stated: "There is a practical line and a difference in degree between the case where the harm is done by the mismanagement of the offending vessel and that where it is one by the mismanagement of another vessel to which the immediate but innocent instrument of harm is attached." 212 U.S. at 474, 29 S.Ct. 339.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.

The libel is dismissed.

Settle order on notice.